Bertram Harnett, J.
The falling out of partners and costockholders in closely held business enterprises can have the bitter personal elements of matrimonial litigation. When it is finally agreed that one shall leave the business, and the other shall stay, we have a form of corporate divorce where the termination arrangements often take on the aura of property settlements. So it is here, with the principals of Dynaport Electronics, Inc. (a Delaware corporation), now enmeshed in deep disputation over their settlement agreement. There is even added an element of corporate custody.
This controversy involves a sale, as part of an over-all settlement, of a stock interest in Dynaport by the departing "outside” shareholders (now defendants) to the remaining or "inside” shareholders (now plaintiffs). The buying insiders gave the selling outsiders an option to repurchase the stock at the same price at which it was sold. As part of the option agreement, the insiders agreed not to dispose of the purchased stock during the option period so as to keep that stock reserved for possible later optional purchase.
Essentially, the insiders urge in a declaratory judgment action that the restriction on stock disposition is illegal as a matter of law, and that, therefore, the option agreement is totally void. The outsiders responded by counterclaiming for judgment declaratory in their favor on the issue of legality of the option agreement. They also seek in other counterclaims injunctive and equitable relief, largely based on claimed fraud by the insiders in maneuvering them out. The insiders then moved here for summary judgment in their case, and the outsiders cross-moved for summary judgment on their counterclaim for declaration of option validity.
The court will grant the outsiders’ motion for partial summary judgment, and deny the insiders’ motion in all respects. The option agreement here, on the undenied facts, is valid as *148 a matter of law. In explanation of its decision, the court will discuss the salient facts, find New York law to be applicable (although Delaware law would yield the same result), find the option to repurchase, as well as the reservation of the stock, to be reasonable and appropriate, and find, in any event, the option agreement would remain valid even if the stock reservation were to be found offensive (which it is not) and excised from the option agreement.
I. Facts
Levey, Fishbane, Saphier, and Kaplan, were all partners in an accounting practice. They also had mutual interests, in some combinations, in ancillary insurance, law, management, and consulting activities.
In 1970, with Malech, an engineer, they formed Dynaport to buy an already functioning electronics business. Each of the five invested money equally, and each received equal shares of stock. Later that year, Dynaport bought a second electrical equipment company. Apparently, both electronics concerns faltered economically, and all their various business relationships suffered internal turmoil.
Serious disputes erupted between the associates, especially, it seems, between Levey and Saphier. By June, 1971, deepening divisions brought things to the breaking point. The lines were drawn: Levey and Fishbane withdrew from the accounting firm; Levey, Fishbane, and Malech voted Saphier and Kaplan out as officers and directors of the Dynaport organization. In response, Saphier and Kaplan sued Levey, Fishbane, and Malech in Delaware, alleging various forms of misconduct in Dynaport. The suit was settled on December 2, 1971 through a number of arrangements largely severing the relationships between the parties in all their enterprises, and readjusting liability for certain indebtedness. It is the disposition of the Dynaport interest in the settlement, and, more narrowly, a distinct document captioned, "Option and Voting Agreement”, dated December 2, 1971 which is now before us.
Saphier and Kaplan both resigned their posts with Dynaport, and each sold their Dynaport shares to Levey, Fishbane, and Malech, as "tenants in common” for $16,000. But, by the "Option and Voting Agreement”, Saphier and Kaplan each retained an option to buy back their shares in Dynaport anytime within 10 years of the agreement for the same $16,000 for which each sold out. Paragraph 4 of the Option and Voting Agreement provided that these shares would "not *149 be sold, pledged, hypothecated or disposed of, by them and [would] at all times during the life of the option * * * be kept reserved subject to [the] option.”
Two years after entering the Option and Voting Agreement, Levey, Fishbane, and Malech came to court to have only the Option and Voting Agreement declared invalid. They complain that they must take the risks and do the work to make Dynaport grow, but that if their efforts succeed and Dynaport flourishes, Saphier and Kaplan will be able to buy back their stock interest for less than its then worth, having risked nothing. Saphier and Kaplan reply essentially that the insiders got what they wanted and that the repurchase option was part of the inducement to them to act in settlement.
Quite obviously, a court cannot help someone escape from an agreement simply because he regrets having made his bargain. But, the insiders ask the court to void the Option Agreement because of an illegality they now detect, and here lies the case.
II. Choice Of Law
While Dynaport is a Delaware corporation, the corporation’s principal activities, and, more importantly, those of its shareholders, all took place in New York. This leads to the issue of which State’s law will govern. While the insiders like the Delaware look, the outsiders seem to prefer the Gotham flavor.
Normally, the law governing incidents of shares of stock follows the State of incorporation. (Palmer v Chamberlin, 191 F2d 532.) However, this is more appropriately a total business settlement involving many elements and numerous New York contacts — there is no doubt that New York is dominantly the parties’ economic place. New York law will govern where the principal contacts aggregate here. (Intercontinental Planning v Daystrom, Inc., 24 NY2d 372; Haag v Barnes, 9 NY2d 554.)
Most to the point, the parties stipulated in their contract that the law of New York was to apply. Such agreements are enforceable, particularly when the New York contact is so substantial as here. (See Wyatt v Fulrath, 16 NY2d 169.)
We conclude that New York law applies. This is likely a legal exercise, however, since the parties seem correctly in agreement that the New York and Delaware law are similar for application to the issues here.
*150 III. Invulnerability Of The Option Itself
Apart from the reservation of the underlying stock, there is no serious dispute that the Option and Voting Agreement is valid and enforceable.
The consideration of the entire corporate divorce settlement is unmistakable and uncontroverted. Very significant rights and duties were exchanged. Moreover, in New York, an option agreement in writing is enforceable without respect to the doctrine of consideration. (General Obligations Law, § 5-1109.)
It requires no citation to hold that options for the purchase of stock are lawful in New York.
The insiders’ contention that a 10-year option period is offensive to New York public policy is without authority. To the contrary, the period is commonplace. Twelve years was found acceptable for a real estate purchase in Trustees of Hamilton Coll. v Roberts (223 NY 56). Twenty years was upheld for an option to buy annuity contracts in Freeport Sulphur Co. v Aetna Life Ins. Co. (206 F2d 5). In Martin v Graybar Elec. Co. (285 F2d 619), the Federal court found New York law permitted a lifetime option to repurchase corporate stock.
Indeed, 10 years as a time period is a stock option classic. That was the original permissible time duration for tax-qualified restricted stock options. (See Internal Revenue Code [1954] [US Code, tit 26], § 424, subd [b], par ([4]).) Ten years is specifically recited as the permissible period under section 53-a of the Insurance Law dealing with optional periods. In New York, a voting trust can endure for 10 years. (Business Corporation Law, § 621.)
The insiders argue that the option price is unfair since the holders take no risk — they can repurchase the stock for the price they originally paid, leaving them to profit by the insiders’ good work. But, this is precisely what an option is about; its holder gives up a consideration to preserve the opportunity to buy into something at a predetermined price. The nature of options and warrants is that they have "up” sides for appreciation and no "down” side beyond the cost of holding the opportunity in place. (Cf. Allen v Biltmore Tissue Corp., 2 NY2d 534.)
The reasonableness and appropriateness of the options under the circumstances given are detailed below.
It is the provision that the insiders will not sell, and will reserve, the stock subject to option that is really the gist of *151 the insiders’ complaint. They argue that this is an unlawful restraint on the alienation of stock, and fatally infects the entire Option Agreement to the point that it must be destroyed. Both contentions are rejected.
IV. Reservation Of Stock During An Option Period Is A Lawful Restraint On Alienation
The purpose of reserving optioned stock, through the agreement of its holders not to sell it, is reasonable and commensurate with the valid undertakings it serves. Where a corporation gives options, it customarily agrees either to have on hand treasury stock or to reserve unissued stock for subsequent exercise. In counterpart, an individual shareholder giving an option to buy his shares assures his optionee, by agreeing not to sell, that the stock will be on hand to meet potential exercise.
The insiders, however, confuse two concepts in concentrating their attack on the reservation as lacking in corporate purpose.
There is, quite apart from corporate conduct, a legal policy militating against unreasonable restraint on the sale of personal property, including shares of stock. (Allen v Biltmore Tissue Corp., 2 NY2d 534, supra.) This conception differs from the requirement of corporate purpose for the doing of an act, although the existence of a corporate purpose may be probative of the reasonableness (as opposed to the arbitrariness or prejudice) of a challenged reservation. The reason for outlawing unreasonable restraint of property in individuals is fundamentally rooted in property law prohibitions against perpetuities and the avoidance of illusory or obnoxious contracts.
Where the optionor, agreeing not to sell stock, is a corporation, and, particularly the issuer, its action must have a corporate purpose, since business corporations can only act lawfully pursuant to their purposes.
The insiders look longingly to two cases to support their theories here, and neither does that. One is the New York case of Rafe v Hindin (29 AD2d 481), where a stockholder agreed never to sell his stock without another’s consent. It was, in effect, a cancellation of the right to sell during another’s lifetime with no good reason shown. It struck at a basic incident of corporate stock, free transferability, without demonstrated reason or advantage. Restrictions, however, will be upheld if reasonable and appropriate to a lawful purpose. (Penthouse Prop. v 1158 Fifth Ave., 256 App Div 685.)
*152 Here, the reservations were not restrictions for their own sake. The outsiders bargained for the options, among other things, and the manifest purpose of the reservation was to assure the availability of the stock for an ultimate exercise of the option. In effect, the reservation is a security device helping to bolster the options, which, in turn, are importantly bound up with the settlement transaction.
The Delaware case of Tracey v Franklin (31 Del Ch 477), seems the insiders’ cohope. Cited by both sides, that case found no difficulty with the restriction on alienation of corporate stock by having it locked into a voting trust. It found fault only with the express nonassignability of the interests in the trust, on the theory that no purpose for that restriction appeared. Referring to all personal property, and not simply stock, the court said (p 484):
"Insofar as concerns restraints upon the alienation of personal property, and in particular of corporate stock, while an owner, in exercising legally permissible freedom to deal with his property, may enter into many transactions which have the effect of restraining its transferability for temporary periods in the future,3 nevertheless, arbitrary restraints on alienation are forbidden and unless restraints are imposed for purposes recognized as sufficient, they will be held invalid.”
"[Footnote 3.] For instance, trusts involving gifts, pledges, cross options and leases for a period of years with an option in the lessee to purchase at the expiration of the term.”
Moreover, and this alone destroys the insiders’ contention, the reasonableness of the restriction is further found in its beneficial effect on the corporation. In short, the arrangement did serve corporate purposes, and the reservation served the arrangement. The parties agreed that the disputation between them was irreconcilable and threatened the very life of Dynaport. The preservation of harmony in the management and the continuity of the corporate life are traditionally corporate purposes. (Emeloid Co. v Commissioner of Internal Revenue, 189 F2d 230; Gazette Pub. Co. v Self, 103 F Supp 779.)
The insiders wanted to run Dynaport without distraction from the outsiders. To buy their period of peace in operation, in which they could have all their own way in seeking to enhance their own stock, they were willing to pay with a free ride to the outsiders, who were in essence guaranteed that they could not do worse than cashing in now. And, from the insider stance, there was sense in that settlement. If the *153 outsiders had remained in place — working, not working, or fighting — they would have been entitled to any appreciation on their stock. Their stock and presence would have overhung any refinancing in any event. If the corporation foundered, the insiders would have lost out themselves. The insiders really traded the $16,000 cash guarantee as the price of having their own unchallenged way in doing what they wanted with Dynaport. The insiders insured their control of the corporation, for even if the options were to be exercised and the shares repurchased, the repurchased stock would have to be voted by the outsiders at the insiders’ direction by virtue of the agreement.
It must be noted that the insiders are people of high business sophistication, including certified public accountants and lawyers. Throughout extensive negotiations, they were represented by able counsel. They cannot be now heard to argue they did not know the content of their acts. The record and the sense of the situation are too plain.
V. The Sale Reservation Is In Any Event Severable From The Option Agreement And Can Be Excised Without Otherwise Affecting It
While the insiders now argue the invalidity of the stock reservation, their real target is the option itself. Notwithstanding the series of settlement transactions for which they bargained on an informed basis, they now seek to improve their deal by unraveling just the option part. And, they seek to do this by a belated foray into the fine print.
The added problem that they find in this expedition, however, is that even if the stock reservation were invalid (and we believe it is valid), the reservation would be pared and the Option Agreement remain valid.
It is elementary law that where a clause not going to the heart of an agreement is invalid, the court, in its discretion, may trim it down to the extent necessary to accomplish the basic purpose of the contract insofar as it is reasonable. (See Karpinski v Ingrasci, 28 NY2d 45; Ferro v Bologna, 38 AD2d 854.) Here, the reservation on sale is a protection to the optionee, a kind of precaution or safety device that the insiders will have available the stock they promised to deliver.
It makes little sense that the presumptive failure of an attempted security device should wipe out the substantive rights it was conceived to protect. The stock reservation is simply ancillary to the obligation to resell and the right to *154 repurchase. For the considerations discussed in Article III of this opinion, the Option Agreement is valid, and we believe it should survive any attempted excision of a clause which, while desirable to the optionee, is not essential to him.
Certainly, the insiders cannot now seek to keep the fruits of the bargain, and, at the same time, receive a partial refund of its cost. They would keep the good and return the bad. If the reservation is as fundamental and dreadful a prospect as the insiders would have us infer, and it is stricken, should not the whole interrelated settlement be stricken and the parties put back in their original presettlement condition? There is no insider suggestion that this be done, nor how or whether it could be done, or whether they want it that way.
VI. Summary
In summary, whether New York or Délaware law applies, the Option Agreement remains lawful. Its term and its effect are lawful. The reservation on the sale of the stock is lawful; it is a reasonable restraint on alienation and serves both individual and corporate purposes. Even if the stock reservation was excised, the option would remain valid. Every which way, the insiders lose, and the outsiders will be entitled to partial summary judgment declaratory of the validity of the Option Agreement.
The insiders’ motion for summary judgment is denied in its entirety. The Option Agreement is valid, and there are issues of fact which preclude summary judgment on such of the fraud and equitable causes of action which may remain.
Settle judgment on notice.