**GUARANTY MORTGAGE COMPANY, Division of First American National Bank, Plaintiff,**

v.

**Z.I.D. ASSOCIATES, INC. and Irving Decter, Defendants.**

**No. 80 Civ. 1154 (VLB).**

United States District Court, S. D. New York.

July 18, 1980.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff.

Alfred V. Greco and Raymond F. Gregory, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

Plaintiff Guaranty Mortgage Company ("Guaranty") brings this diversity action against defendants Z.I.D. Associates, Inc. ("Z.I.D.") and Irving Decter, Z.I.D.'s president, seeking brokerage fees with respect to certain loans it brokered on behalf of Z.I.D.

Guaranty is a division of First American National Bank, a banking corporation organized and existing under the laws of the United States and having its principal place of business in Nashville, Tennessee.[1] Z.I.D. is a corporation which was formed for the purpose of developing and building a hotel near the Nassau Coliseum in Uniondale, New York. Its principal place of business is in New York, and it was incorporated in a state other than Tennessee. Jurisdiction is predicated upon diversity of citizenship (28 U.S.C. § 1332).

Plaintiff and defendant Z.I.D. executed a written agreement on May 10, 1978. By its terms plaintiff undertook to seek, on behalf of Z.I.D., construction and permanent financing loans for the hotel project in Uniondale. The plaintiff's complaint alleges that it procured commitments for the loans sought, and it claims brokerage commissions under the written agreement, or on principles of *quantum meruit*, in the principal amount of $230,000.

This case is now before me on plaintiff's motion for an order of attachment and defendants' motion to dismiss.

A temporary restraining order was issued at the outset of the litigation, enjoining Z.I.D., pending hearing, from transferring assets in such amount as to leave Z.I.D. with assets in an amount less than the principal amount sought. After several extensions of the temporary restraining order on consent of the parties, a hearing was held on plaintiff's motion for an order of attachment under section 6201(3) of New York's Civil Practice Law and Rules ("CPLR").

At the close of the plaintiff's evidence, the defendants orally moved to dismiss the complaint and the application for an order of attachment on the ground of plaintiff's failure to make out a *prima facie* case. I denied that motion. The defendants also orally moved to dismiss the complaint on the ground of plaintiff's failure to allege that it is licensed in New York as a real estate broker, as required by section 442–d of New York's Real Property Law ("RPL"). I reserved decision on this motion. At the conclusion of the hearing it was agreed that the temporary restraining order would continue in effect until my disposition of the matter before me.

### II.

For the reasons set forth below, the defendants' motion to dismiss the complaint based upon failure to comply with RPL § 442–d is granted, and plaintiff's motion for an order of attachment is denied as moot. The temporary restraining order is vacated. The complaint is dismissed.

### III.

On the evidence received at the hearing and the pleadings herein, I find the following facts for the purposes of consideration of the matters before me.

On May 10, 1978, Guaranty and Z.I.D. entered into a written agreement under which Guaranty, in behalf of Z.I.D. and for an agreed consideration, undertook to obtain a construction loan and a permanent financing loan with respect to Z.I.D.'s Long Island hotel project.

Paragraph 19 provided that the agreement "shall be governed by and construed under the laws of the State of Tennessee . . . ."

Pursuant to the agreement, commencing June 23, 1978 Guaranty submitted "loan

---

1. The *Guaranty* division of First American National Bank is situated in Brentwood, Tennessee.

packages" to at least twenty-three potential lenders, sixteen of whom were located in states other than New York. As a result of Guaranty's efforts, on January 29, 1979 the Bank of New York ("BONY") issued and delivered to defendants its commitment for a construction loan for $17 million, and on March 16, 1979 the Equitable Life Assurance Society of the United States ("Equitable") advised defendants that it had approved a mortgage loan for permanent financing in the amount of $14.5 million.

The BONY and Equitable commitments were made as a result of Guaranty's efforts, and commissions became payable under the agreement with respect to those loans in the amount of $230,000.

By agreement dated November 28, 1979, Z.I.D. has agreed to sell to Nassau Associates ("Nassau"), a Washington, D. C. partnership, its interest in the hotel project, which consists mainly of a ground lease from Nassau County [2] and the two financing commitments from Equitable and BONY. Essentially, this agreement provides for the transfer of Z.I.D.'s interest in return for Nassau's cash payment to Z.I.D. upon closing of $150,000, followed by a second cash payment of $200,000, to be paid in four equal annual installments beginning with the second full year of the hotel's operation, which is now expected to begin between June and September 1982. Nassau is also to assume $480,000 of Z.I.D.'s obligations on certain promissory notes.

Plaintiff has not alleged that it was duly licensed in New York as a real estate broker on the date when the alleged cause of action arose.

### IV.

■ A federal district court sitting in a diversity action sits as a court of the state and must apply the law of the state, including its statutes, in deciding controversies brought before it. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Lev v. Aamco Automobile Transmissions, Inc.,* 289 F.Supp. 669, 670 (E.D.N.

Y.1968). *See also* Judiciary Act of 1789, Ch. 20, § 34 (Rules of Decision Act, as amended), 1 Stat. 73 (current version at 28 U.S.C. § 1652).

New York's Real Property Law § 442–d provides:

> No person, copartnership or corporation shall bring or maintain an action in any court of this state for the recovery of compensation for services rendered, in any place in which this article is applicable, in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person was a duly licensed real estate broker or real estate salesman on the date when the alleged cause of action arose.

Against application of this statute to bar plaintiff's action plaintiff raises three arguments.

First, plaintiff asserts that as a national banking association chartered under the National Bank Act, 12 U.S.C. § 21 *et seq.,* plaintiff cannot be compelled to comply with a state statute, such as RPL section 442–d, that impedes its congressionally mandated powers.

Second, plaintiff argues that the New York statute is in the nature of "door-closing" legislation, which cannot be invoked to bar the suits of national banks.

Third, plaintiff argues that under New York's choice of law rules, RPL section 442–d is rendered inapplicable to plaintiff's contract action.

#### 1. *Plaintiff's status as a national bank.*

■ Plaintiff's first argument, that as a national bank it is immune to the application of state laws conflicting with its congressionally granted powers, rests on the crucial assumption that plaintiff's activities as a mortgage loan broker were carried on as incidental to congressionally granted powers. This assumption is misplaced.

---

**2.** The ground lease is assignable only on consent of the county, which had not, at the time

of the hearing, been granted or, in fact, applied for.

The question of whether plaintiff is authorized to conduct mortgage loan brokering under the National Bank Act is necessarily relevant to whether it may look to that act as a shield against the applicability of a conflicting state law.

Section 92 of the National Bank Act, 12 U.S.C. § 92, allows national banks to broker loans on real estate and to receive a commission for their services in doing so, but narrowly restricts this authorization to national banks located and doing business in places whose population does not exceed 5,000 inhabitants, and to loans pertaining to real estate located within one hundred miles of the bank.[3] Plaintiff clearly does not come within this narrow grant of authority, since the real estate that is to secure the loan commitments brokered by plaintiff is located in New York, while the bank is located in Tennessee.[4]

Under the doctrine of *expressio unius est exclusio alterius*, Section 92 must be read to preclude what it does not expressly sanction. The loan brokering provisions of Section 92 do not appear to have been interpreted in any reported decisions, but their companion provisions relating to the power of national banks, under the same narrowly limited circumstances, to act as insurance agents have been the subject of judicial scrutiny. In *Saxon v. Georgia Ass'n. of Indep. Ins. Agents*, 399 F.2d 1010 (5th Cir. 1968), the doctrine of *expressio unis est exclusio alterius* was applied to preclude certain national banks in places of more than 5,000 population from acting as insurance agents in contravention of the implied proscriptions of Section 92. *Id.* at 1013–14. The same result is called for here. Plaintiff has not drawn my attention to legislative

**3.** 12 U.S.C. § 92 provides, in relevant part:
>  In addition to the powers now vested by law in national banking associations organized under the laws of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, ... act as the broker or agent for others in making or procuring loans on real estate located within one hundred miles of the place in which said bank may be located, receiving for such services a reasonable fee or commission: *Provided, however,* That no such bank shall in any case guarantee either the principal or interest of any such loans ....

**4.** Plaintiff argues that the restrictive provisions of Section 92 of the National Bank Act relating to "loans on real estate" should not be applied against plaintiff in this case because of an amendment to the Federal Reserve Act, Ch. 6, 38 Stat. 251 (1913) (as amended). The amendment, now codified as § 371(c) of Title 12 of U.S.C., gives to national banks the option, when making loans for the construction of buildings, of classifying those loans not as "loans on real estate" but as ordinary "commercial loans." 12 U.S.C. § 371(c) provides in relevant part:
>  (c) Loans made to finance the construction of a building or buildings and having maturities of not to exceed sixty months where there is a valid and binding agreement entered into by a financially responsible lender or other party to advance the full amount of the bank's loan upon completion of the build-

ing or buildings, ... may be considered as real estate loans if the loans qualify under this section, or such loans may be classed as commercial loans whether or not secured by a mortgage or similar lien on the real estate upon which the building or buildings are being constructed, at the option of each national banking association that may have an interest in such loan: *Provided,* That no national banking association shall invest in, or be liable on, any such loans classed as commercial loans under this subsection in an aggregate amount in excess of.100 per centum of its actually paid-in and unimparted capital plus 100 per centum of its unimpaired surplus fund.

Act of Aug. 22, 1974, Pub.L. No. 93–383, Tit. VII, § 711, 88 Stat. 716.

Plaintiff's argument is unpersuasive for two reasons. First, it accounts, if at all, only for the BONY construction financing loan allegedly obtained by defendants through plaintiff's services and does not address the permanent financing loan commitment from Equitable. Second, § 371(c) gives the option of classifying loans for construction of buildings as "commercial loans" to "each national banking association that may have an interest in such loan...." When read in conjunction with the first two words of the subsection—"Loans made"—it is evident that the national banks considered to "have an interest in" the loans, and thus to be capable of exercising the option provided for, are banks which made loans, not banks which may have procured loans for a borrower. *See* H.R.Rep. No. 1114, 93d Cong., 2d Sess. 81 (1974).

history that would permit a different interpretation of the statute, and indeed it appears that the legislative history of Section 92 requires the interpretation here made. *See* 53 Cong.Rec. 11001 (1916) (Letter of Jno. Skelton Williams, Comptroller of the Currency, to Senator Robert L. Owen (June 8, 1916)).[5]

National banks are expressly authorized under 12 U.S.C. § 24, Seventh, to exercise all such incidental powers as shall be necessary to carry on the business of banking:

> [A] national banking association ... shall have power—
>
>     \*     \*     \*     \*     \*     \*
>
> Seventh. To exercise ... all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter....

Under 12 U.S.C. § 24, Seventh, a national bank's "incidental" activity would be "authorized" if it were closely related to banking activities conducted under the express powers granted to national banks under the National Bank Act:

> [A] national bank's activity is authorized as an incidental power, "necessary to carry on the business of banking," within the meaning of 12 U.S.C. § 24, Seventh, if

it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power.

*Arnold Tours, Inc. v. Camp,* 472 F.2d 427, 432 (1st Cir. 1972). I find it difficult to comprehend how, under the *Arnold Tours* test, plaintiff's mortgage loan brokering is "convenient or useful" in connection with plaintiff's performance of any of the express powers enumerated above.

I conclude that plaintiff's performance of the function of brokering loans for the construction and permanent financing of a hotel project was neither an activity directly authorized by the National Bank Act, nor was it an activity "authorized as an incidental power, 'necessary to carry on the business of banking'." *Arnold Tours, Inc. v. Camp, supra,* at 432. The authorities cited by plaintiff to the contrary, 5 N.Y.Jur. *Banks & Trust Cos.* §§ 196, 197 (rev'd 1975); 9 C.J.S. *Banks & Banking* § 161(c) (1938 ed.), are either unpersuasive or inapposite. Thus plaintiff's status as a national bank is not by itself sufficient to withstand the application of RPL § 442–d to bar this suit.

### 2. *Section 442–d as "door-closing" legislation.*

■ Plaintiff's second argument against the applicability of Section 442–d is that the

---

**5.** Nor can plaintiff find refuge in the language of 12 U.S.C. § 24, Fourth, which gives to national banks the power "[t]o sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons."

Plaintiff has pointed to no expression of Congress' intention to preempt valid exercises of the states' police power that, like RPL § 442–d, restrict or eliminate altogether a national bank's right to sue. Herein lies the distinction between this case and *Easton v. Iowa,* 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1903), cited by plaintiff, which reversed the conviction of the president of a national bank for having violated an Iowa statute making it a criminal offense for a bank officer to accept deposits while knowing his bank to be insolvent. The state law at issue in *Easton,* as applied to the national bank, directly affected the conduct of banking opera-

tions, a subject area that Congress had expressly and completely preempted by the regulatory scheme provided for in the National Bank Act. *See id.* at 230- 31, 23 S.Ct. at 290. The provision relating to the prosecution of actions in the courts by national banks does not concern banking operations. It is, instead, a general affirmation of a national bank's right, like other corporations, to sue and be sued in its own name, with the qualification that its rights in so doing are to be determined in accordance with the rules applicable to natural persons. Thus 12 U.S.C. § 24, Fourth, simply reserves to national banks whatever rights are provided in law to natural persons for the vindication or defense of claims in the courts, with the effect in this case of subjecting plaintiff to the license requirement of RPL § 442–d.

New York statute is in the nature of "door-closing" legislation, which should not be invoked to bar the assertion of rights in which the federal government has expressed an interest. Plaintiff asks that I analogize from judicial interpretations of New York Business Corporation Law § 1312 to hold that RPL § 442–d cannot be construed to bar this action.

BCL § 1312(a) provides as follows:

(a) A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation.

Plaintiff relies on *Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320 (2d Cir. 1977), which involved the question of whether New York's Business Corporation Law § 1312 could be invoked to preclude a non-qualifying foreign corporation from maintaining a diversity action to compel arbitration pursuant to the Federal Arbitration Act. The Second Circuit held, on two grounds, that it could not.

As a preface to its first ground, the court considered it "highly significant" that the action was brought under the Federal Arbitration Act: it was from this federal act, rather than from state law, that plaintiff's substantive right, namely, the right to compel arbitration, derived. Given that substantive rights in the case arose under federal rather than state law, it remained to be determined whether § 1312 could affect a federal court's jurisdiction. The court of appeals cited *Hot Roll Mfg. Co. v. Arone Equip. Co.*, 38 App.Div.2d 339, 329 N.Y.S.2d 466 (3d Dep't 1972), for the proposition that section 1312 affected only a non-qualifying corporation's legal capacity to maintain an action, and did not affect the court's jurisdiction:

The *Hot Roll, supra,* holding logically followed prior decisions of the New York courts that the word "maintain" in BCL § 1312(a) does not mean "commence," so that a New York court would not be forced to dismiss an action, once begun, for failure of a party to comply with § 1312(a) but the party may pay the fees and taxes and then go forward with his action. (Citations omitted).

550 F.2d at 1324.

On this ground of decision *Grand Bahama* is clearly distinguishable. The federal statute here involved, the National Bank Act, is not invoked as a source of substantive rights, as was the Federal Arbitration Act in *Grand Bahama*. The substantive rights on which plaintiff here relies for its claims arise from state law, either New York's or Tennessee's, depending on the interpretation to be given to paragraph 19 of the parties' agreement.

*Grand Bahama's* second ground of decision was the Commerce Clause. If BCL § 1312 were to be interpreted to be a door-closing statute which affected a federal district court's jurisdiction, it would impermissibly interfere with interstate commerce by placing an undue "financial and procedural burden on a foreign corporation seeking to vindicate its right to bring a diversity action before the federal courts." *Grand Bahama, supra,* at 1324. Quoting *Markham v. City of Newport News*, 292 F.2d 711, 718 (4th Cir. 1961), the court stated:

'The Erie doctrine does not extend to matters of jurisdiction or, generally, to matters of procedure.... A nonresident litigant on resorting to the federal diversity jurisdiction should obtain the same relief a resident litigant asserting the same cause of action would receive in the state courts.'

In the present case, of course, a New York resident litigant would not be subject to BCL § 1312(a) in the courts of New York. If a nonresident litigant is to receive the same relief as a resident of New York in a federal diversity suit,

then, the offending local statute must give away. *Grand Bahama, supra,* at 1325.

The obvious point of distinction is that in the case at bar the local statute does not "offend" in the way BCL § 1312(a) offended in *Grand Bahama*. RPL § 422–d does not distinguish between foreign and domestic corporations in respect of the relief available in New York courts. It closes the court doors to residents and nonresidents alike if they do not meet its license requirements.

In perhaps the only reported federal case to have involved RPL § 442–d specifically, the district court applied the statute to bar the suit of a lawyer seeking to recover a brokerage commission on an interim construction financing commitment obtained by the lawyer and another pursuant to written agreements with defendants. Even though the plaintiff, as a lawyer, was not required to be licensed as a real estate broker, *see* RPL § 442–f, the rule of § 442–d was applied to bar plaintiff's diversity action because his co-broker was not licensed. *Meltzer v. Crescent Leaseholds, Ltd.,* 315 F.Supp. 142, 146 (S.D.N.Y.1970) (Mansfield, J.), *aff'd,* 442 F.2d 293 (2d Cir. 1971).

### 3. Choice of law.

■ Plaintiff's third argument is that RPL § 442–d is rendered inapplicable to plaintiff's contract action under New York's choice of law rules. Plaintiff asserts that the parties' choice of law reflected in paragraph 19 of their agreement, which provides that the agreement "shall be governed by and construed under the laws of the State of Tennessee . . .," should be given effect, particularly because the jurisdiction specified in the agreement is a place in which more than merely incidental elements of performance have occurred. *See Levey v. Saphir,* 83 Misc.2d 146, 149, 370 N.Y.S.2d 808, 813 (Sup.Ct., Nassau County 1975).

Plaintiff's gathering of the data to be placed in the "loan packages" distributed to potential lenders appears to have been accomplished in Tennessee, and this activity, while not limited to the two financing commitments from which defendant's liability under the brokerage agreement arises, constituted more than a merely incidental element of performance. Nevertheless, Thomas Creighton, plaintiff's vice president in charge of carrying out the alleged agreement with defendants, stated that between the time the work on the hotel project started and the time that loan packages were mailed to potential lenders he was in New York in relation to the project on the average of three days a week. This appears to have continued to be his pattern in negotiating the Equitable and BONY loan commitments.

It has been held by New York courts that though the parties' intention and the place of making or performance of the contract are to be given heavy weight in determining the applicable law in contract actions, emphasis is also to be given to the law of the forum having the most significant contacts with the matter in dispute. *Reger v. National Ass'n of Bedding Mfrs., Etc.,* 83 Misc.2d 527, 539, 372 N.Y.S.2d 97, 114 (Sup.Ct. Westchester County 1975) (citing, *inter alia, Haag v. Barnes,* 9 N.Y.2d 554, 559, 175 N.E.2d 441, 443, 216 N.Y.S.2d 65, 69 (1961).

The matter here in dispute is defendant's liability under an agreement, by the terms of which liability could arise only as to loan commitments that were actually made. Since plaintiff's activities produced two loan commitments in favor of defendants, the forum having the most significant contacts with the matter in dispute is the forum in which were conducted activities related to the two loan commitments on which defendants' liability under the alleged agreement is based. It appears that a substantial proportion of such activities were performed, albeit fortuitously, in New York. It is possible, therefore, that New York is the forum with the most significant contacts with the matter in dispute, and that its law, not Tennessee's, should be applied.

Any doubt, however, is resolved by the public policy factor to be considered in New

**108**

York's choice of law formulation. The question to be asked is whether enforcement of the particular agreement under the law of the forum chosen in the agreement by the parties represents an affront to New York public policy. *Haag v. Barnes*, 9 N.Y.2d 554, 560, 175 N.E.2d 441, 444, 216 N.Y.S.2d 65, 69. Assuming it to be true, as plaintiff asserts in its memorandum without express quotation of the appropriate statutory language, that a bar similar to that of RPL § 442–d would not operate against plaintiff under Tennessee law, I find that application of Tennessee law here would be an affront to the public policy of New York. With respect to brokerage services rendered in New York—and whatever law obtains, there is no question that a substantial portion of plaintiff's brokerage services were in fact rendered in New York—it is New York State policy, as expressed in RPL § 442–d, to protect those who enter into agreements with real estate brokers, whose relationships of trust and confidence with their clients give them opportunities to extract illegal gains. *Galbreath-Ruffin Corp. v. 40th and 3rd Corp.*, 19 N.Y.2d 354, 362, 227 N.E.2d 30, 33, 280 N.Y.S.2d 126, 130–31 (1967). Though the rule of Section 442–d as here applied is a harsh one, the law is extremely clear on the point, and plaintiff has brought to my attention no exception to the public policy consideration referred to above that would allow me to disregard the clear requirements of the statute.

So ordered.