OPINION OF THE COURT
Arthur J. Cooperman, J.
Simply stated, this is an action on a contract for the loan of money, the balance of which plaintiffs claim to be $6,800. Defendants interposed an answer, asserting a general denial and the defense of payment.
The trial, however, revealed an unusual and unfortunate human drama involving emigrants from a communist country who were striving for a new life in a democracy.
In 1974, the Birger and Tuner families were Russian Jews who were planning to resettle in the United States. Unfortu *64 nately, the Tuners were in desperate need of money in order to realize their plans. Not only did they require funds to facilitate their departure, but additionally, they were faced with a demand that Frieda Tuner, the' daughter of Rita and Sender Tuner, make good on shortages at her place of employment. Frieda Tuner was charged by her superior with selling television sets for which the business records indicated insufficient payment on hand. She was told to replace the missing funds or else face criminal charges. Needless to say, a failure to come up with the money would have interfered with the Tuners’ plans to emigrate.
On several occasions, Rita Tuner importuned Svetlana Birger to provide the funds needed to help the Tuners in their plight.
Thus is came to pass that in September, 1974 in Odessa, Russia, defendant Rita Tuner wrote on a strip of material approximately two inches high and three feet long, in Russian, the following: "I, Tuner Rita borrowed from Birger R.S. the sum of eight thousand five hundred rubles (Rubles 8,500). I promise to pay back this amount in dollars up to the year 1976 or her daugher Birger S.M.”
She thereupon signed her name and that of her husband, defendant Sender Tuner, and gave the document to the plaintiffs, who turned over to her the 8,500 rubles.
Within the next year all of the parties had emigrated to this country. By May, 1978, between $1,700 and $2,000 (depending on whose version is believed) had been repaid. When plaintiffs were advised that no further payments would be made, this action was instituted.
Plaintiffs, Ratsya Birger and her daughter, Svetlana Birger, contend that defendants, Rita Tuner, Sender Tuner and their daughter, Frieda Tuner, agreed to repay the 8,500 rubles with $8,500. And since $1,700 was in fact paid, a balance of $6,800 is now due.
Defendants, having pleaded payment in their answer, contend that in the Soviet Union the commonly accepted rate of exhange of dollars to rubles at the time of the transaction was one to five. Accordingly, they assert that since it is conceded that $1,700 was repaid to plaintiff the obligation is discharged.
The principal issue to be dealt with here, and one which was not raised until the time of trial, is the following:
May an agreement for the loan of rubles in the Soviet *65 Union to be repaid in dollars in the United States be enforced here even though it is contrary to the laws of the country where it was made?
Ordinarily, the affirmative defense of illegality must be pleaded, to avoid surprise (CPLR 3018). In this case, the element of surprise does not exist (Carlson v Travelers Ins. Co., 35 AD2d 351). In any event, this court must nonetheless deal with the issue of illegality in the interests of justice (Rapp v Cansdale, 29 Misc 2d 236, affd 12 AD2d 884).
Several critical factual issues arose during the course of trial that require resolution before dealing with the major question of enforcement of an illegal contract.
Plaintiff Svetlana Birger testified that after Rita Tuner had made several requests for a loan of money, consent was finally given and a meeting was arranged at the Birger apartment. Ratsya Birger, her daughter Svetlana and Svetlana’s son, Michael, were home when the Tuner family — Rita, Sender and Frieda Tuner, along with her infant daughter — arrived to seal the agreement. The defendants explained the circumstances of the threat of criminal charges hanging over Frieda Tuner’s head and their urgent need for money.
The agreement was drawn up in Rita Tuner’s hand when plaintiff Ratsya Birger insisted upon a written instrument. Although Rita Tuner referred to herself as the obligor, she affixed her own and her husband’s signature to the agreement. Frieda Tuner, although present throughout, was not mentioned in the agreement in any way. The 8,500 rubles, derived from the estate of the deceased husband and father, respectively, of the plaintiffs, was thereupon counted out and paid over.
A year later, the Birgers left Russia, the contract in question sewn into the hem of Svetlana Birger’s dress.
Defendant Rita Tuner testified that when she learned that her daughter’s office director required immediate payment she contacted Svetlana Birger without the knowledge of her husband or daughter. She further testified that she received the money from Svetlana Birger on a street corner and that her husband and daughter remained unaware of the transaction. Although he knew that 2,000 rubles were being borrowed he did not know about the daughter’s "problem”. It was not until a year after the Tuners arrived in the United States (May, 1975) that Rita Tuner told her husband.
*66 She testified — and presented money order stubs and copies in support — that she subsequently paid $2,003.50 to plaintiff Svetlana Korol (Birger). On cross-examination she confirmed that she had promised to repay the loan in dollars. A record she had made of one $150 payment was to the effect that 150 rubles had been repaid. Further payments were discontinued when both Rita and Sender Tuner became ill.
The plaintiffs’ witness, Kevin Garvey, an officer in the international division of the Chase Manhattan Bank, testified that the exchange rate of dollars to rubles, which is set by the Soviet government, fluctuated between $1.3 — $1.4 per ruble during the period of time in question.
Defendants’ expert witness, Arkade Rutman, a former attorney and Judge in Minsk, testified that the transaction was "ineffective” in the Soviet Union. The purchase of dollars is a crime and a contract for the loan of money in excess of 500 rubles must be notarized. Money in a sum above the legal limit was being removed from the Soviet Union. In essence this was a black market transaction. However, he testified that the usual black market exchange rate in the USSR was $1 for 6 to 7 rubles. Interestingly, the witness asserted that on three separate occasions he had been a party to similar transactions relating to the emigration of Soviet citizens to the United States.
Upon a fair preponderance of the credible evidence this court finds that the agreement was consummated in the presence of all the parties to this action. Although defendant Rita Tuner was clearly the moving force behind the agreement, it would strain belief to credit her version that the transaction took place on the street. Additionally this court finds that (1) it was the understanding of the parties that 8,500 rubles was being loaned for the purpose of aiding defendants in their unfortunate circumstances just prior to their departure for America; (2) the parties all intended to move to the United States; (3) the money was to be repaid with $8,500, and (4) defendant Rita Tuner repaid $2,003.50 of the loan.
There appears to be no question that the Birger-Tuner contract was illegal in the Soviet Union. As a general rule, no action can be based on an illegal agreement (10 NY Jur, Contracts, § 173). If the contract is malum in se, no exceptions apply to the general rule (Tracy v Talmage, 14 NY 162). Where it is merely malum prohibitum, there is ample author *67 ity for permitting a weighing of the relative culpabilities of the parties before granting relief to the party who advanced funds (Tracy v Talmage, supra, p 181; Pratt v Short, 79 NY 437; Smith v Pope, 72 AD2d 913). In effect, plaintiffs were circumventing the restrictive currency laws of the USSR. Defendants were equally blameworthy as to that aspect of the transaction. Additionally, defendants were using the borrowed funds to pay off third persons to avoid criminal charges. Under the circumstances, this court finds that the parties were not in pari delicto. However, it is doubtful that the traditional equitable relief afforded in such cases is capable of being granted in this court (see Irwin v Curie, 171 NY 409; CCA, §§ 202, 212, and cases cited thereunder).
Moreover, this appears to be one of those extreme cases where public policy requires that relief be given to a party to a contract in violation of a statute which is malum prohibitum, whether or not the parties are in pari delicto (Rosasco Creameries v Cohen, 276 NY 274). It cannot be denied that the public policy of this member State of the United States is to further the right of people to freely contract, maintain property and move about without confiscatory monetary penalties (note SCPA 2218 which allows payment of funds into court when the distribution to beneficiaries in a foreign country would deny them the benefit or use of those funds).
Plaintiffs committed no act of moral turpitude. Although they stood to gain by the illegal loan, basically they were assisting defendants in a time of unparalleled need (cf. Liebman v Rosenthal; 185 Misc 837, affd 269 App Div 1062).
The parties contracted on the assumption that they would all move to the United States. The contract was to be performed in the United States. There is authority for resolving the question of applicability of law relating to the legality of the contract in favor of this jurisdiction (Irving Trust Co. v Deutsch—Atlantische Telegraphengesellschaft, 22 NYS2d 581; Pan Amer. Securities Corp. v Fried, Krupp AG., 169 Misc 445; affd 256 App Div 955; 15 Williston, Contracts [3d ed], § 1792).
Of greater import, however, is the fact that New York has the most significant contacts with the matter in dispute. The parties all reside here. The currency of repayment was dollars. It is with a view toward carrying out the intention of the parties and effecting the best practical result that this court will apply to the transaction in question the contract law of this jurisdiction and leave the Soviet statute and policy where *68 it belongs (Auten v Auten, 308 NY 155; 8 NY Jur, Conflict Laws, § 17).
Defendant Sender Tuner cannot escape liability on the ground that the contract did not name him as a borrower. He was present when the transaction was consummated and in view of the benefit he obtained from it, he cannot now deny the authority of his wife to act for them in this family transaction (Kozecke v Humble Oil & Refining Co., 46 AD2d 986; Warren v Hoch, 276 App Div 607). The same cannot be said for defendant Frieda Tuner. She was neither named in the contract nor had her signature affixed. Without more, it was not reasonable for plaintiffs to assume that she was accepting liability for the loan.
Accordingly, judgment for plaintiffs against defendants Rita Tuner and Sender Tuner in the sum of $6,496.60, with interest from January 1, 1977.