**BANK ITEC N.V., Plaintiff,**

v.

**J. HENRY SCHRODER BANK & TRUST COMPANY, Defendant.**

**Oranje-Nassau Groep B.V., Additional Defendant on Counterclaims.**

**No. 84 Civ. 0371 (GLG).**

United States District Court, S.D. New York.

June 18, 1985.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Boston, Mass., B.A. Willensky, Breed, Abbott & Morgan, New York City, for plaintiff; Sharon Litwin, David E. Lurie, Boston, Mass., of counsel.

Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, for defendant; Robert S. Carlson, Sarah S. Gold, Robert Knuts, New York City, of counsel.

GOETTEL, District Judge:

Throughout my tenure on this Court, the Second Circuit has taken care to instruct the district judges of this circuit that summary judgment is to be applied sparingly. *See Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975); *Wards Co. v. Stamford Ridgeway Associates and Trim Fashions, Inc.*, 761 F.2d 117 (2d Cir., 1985). Of course, I have also noted the Second Circuit's occasional references to the "salutary purposes of summary judgment." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Among these is "avoiding protracted, expansive and harassing trials." *Id.* Granting summary judgment in this case dutifully serves these purposes.

This action arises out of a complicated multi-party transaction involving a Dutch bank, a New York bank, and a now bankrupt Florida insurance company. The Dutch bank's corporate parent is a third-party defendant. Before the Court is the defendant New York bank's motion for partial summary judgment on its breach of contract counterclaim. The motion of the plaintiff's corporate parent to dismiss the counterclaims against it is also before us. For the reasons stated below, the defendant's motion for partial summary judgment is granted. That holding forecloses the need to decide the other motion before us.

## I. *Factual Background*

In May 1982, the plaintiff, Bank Itec N.V. ("Itec"), a commercial bank organized

under the laws of the Netherlands, loaned approximately $6 million to Christiaan G. Walhof ("Walhof") to enable him and his Florida holding company, First Florin Corporation ("First Florin"), to purchase all the capital stock of Gulf American Insurance Company ("Gulf American"), a Florida casualty insurer. Subsequently, Itec decided that, as a result of the legal lending limits imposed upon it by the Netherlands Central Bank, Itec could not make such a large loan. Therefore, in mid-August of 1982, Itec approached the defendant, J. Henry Schroder Bank & Trust Company ("Schroder"), with a proposal that the latter loan Walhof $3 million so that it could pay off its loan from Itec. Schroder has claimed that this was a "fronting loan" made merely to accomodate Itec's desire to comply with the Dutch banking laws.

Out of the negotiations that followed came an agreement between the various parties that required Schroder to loan Walhof and First Florin $3 million. Walhof and First Florin gave Schroder a note (the "Note") promising to repay the $3 million loan. The agreement also required Walhof to repay his $3 million loan from Itec. In turn, Itec was to assign to Schroder one-half of its rights to various security interests that it held in Gulf American. These included Itec's title to and interest in a surplus note (the "Surplus Note") that Gulf American had pledged to Itec as security for Itec's loan to Walhof. Itec and Schroder entered into a letter agreement (the "Letter Agreement") reiterating the terms noted above, with Itec guaranteeing Walhof and First Florin's obligation to Schroder. The pertinent portions of the Letter Agreement are set out in the margin.[1]

On August 27, 1982, the day after the agreement was signed, Itec deposited $3 million in a time deposit account with Schroder's Grand Cayman branch. For more than a year after the agreements were signed, there were no apparent problems. Indeed, in August 1983, the one-year period of the loan, as well as the other agreements between the parties, was extended for another year, to August 26, 1984.

Relations between the parties took a turn for the worse a month later when Itec

1.    Reference is made to a promissory note (the quote Note unquote) of even date made by Mr. Christiaan G. Walhof and the First Florin Corp. (collectively the quote Borrower unquote), pursuant to which you are granting a loan to the Borrower in the principal amount of US $3,000,000. The principal amount is repayable on August 26, 1983, or before such date, subject to the conditions set forth in the Note.
... Bank Itec N.V. (quote Bank Itec unquote) hereby undertakes that, in the event that on August 26, 1983 the Borrower shall not have paid the principal amount, together with all interest and other charges due thereon under the Note, Bank Itec will, upon notice by Schroder, promptly (but in any event no later than 30 days after the date of said notice) cause all rights and obligations under the Note to be assumed by another lending institution as substitute lender (which may be Bank Itec itself), as a result of which Schroder will receive directly from such substitute lender full payment of the principal amount, together with all interest and other charges due thereon under the Note. Except as hereinafter provided, this undertaking is unconditional, and will not be affected by the financial condition or bankruptcy of Mr. Walhof, the First Florin Corp. or Gulf American Insurance Company.

The foregoing undertaking of Bank Itec shall be subject to, and be limited by, the provision of the Wet Toezicht Kredietwezen, as then in effect, or any similar laws, now or hereafter existing, which regulate banks domiciled in the Netherlands, and any rules, regulations, directives or decrees promulgated thereunder, including particularly the rules governing the legal lending limit of the amount loaned to any one Borrower. In the event that the Note cannot be assumed by a substitute lender other than Bank Itec and Bank Itec cannot assume all the rights and obligations under the Note as a result of its then prevailing legal lending limit or for any other reason whatsoever, Bank Itec agrees to purchase from the Borrower at face value the surplus note ... so that the proceeds may be applied by Schroder to repayment of the Note, together with all interest and other charges due thereon (and by their respective signatures in the space provided at the end of this letter the Borrower agrees to sell the same to Bank Itec for such purpose).

\*    \*    \*    \*    \*    \*

This agreement shall be governed by and interpreted in accordance with the laws of New York.
Van Der Lugt Affidavit, Exhibit B.

informed Schroder that Gulf American was financially unstable and asked Schroder to assist Itec in saving the casualty insurer from insolvency. Schroder declined. On November 3, 1983, Gulf American consented to the appointment of a receiver. Walhof and First Florin failed to make the next interest payment due and owing Schroder, and Schroder informed Itec of this failure. On December 5, 1983, Schroder gave Walhof and First Florin notice of acceleration and Itec notice that within 30 days it would be required to fulfill Walhof's and First Florin's obligations under the Note. (Itec had already informed Schroder that no substitute lender could be found and that Itec was constrained by the legal lending limits of the Netherlands' banking laws from assuming the obligations itself. Itec had also refused to purchase the Surplus Note.)

## II. *The Litigation*

In the beginning of January 1984, Itec repeated its refusal to substitute itself as lender under the Note or to purchase the Surplus Note. Schroder reacted on January 6, 1984, by setting off the principal and interest accrued in Itec's time deposit account against the principal and interest that Schroder claimed to be due and owing under the terms of the Letter Agreement. Itec then filed this action for recovery of the more than $3 million set off from its account. It also moved for a preliminary injunction granting the same relief.

In March 1984, Schroder filed its answer and counterclaims against Itec, against Itec's parent, Oranje-Nassau Groep, B.V. ("ONG"), and against ONG's parent, Compagnie Generale d'Industrie et de Participations ("CGIP"). Schroder asserted five counterclaims against Itec: a breach of contract claim, two claims of common law fraud, one claim of a securities law violation, and one RICO claim. The general allegation underlying the four non-contract counterclaims is that, from the time of the original negotiations, Itec either was aware, or should have been aware, of a number of facts concerning itself and Gulf American, which, if conveyed to Schroder, would have caused Schroder not to have made the loan to Walhof and First Florin or to have entered into any agreements with Itec. Schroder's sixth counterclaim alleged that ONG and CGIP had interfered with Itec's performance under the Letter Agreement. The complaint also named ONG and CGIP as defendants in one of the common law fraud claims and in the securities law fraud claim.

On April 25, 1984, the Court granted in part Itec's motion for preliminary injunctive relief. It ordered Schroder to return the $3 million to the time deposit account but ordered Itec to leave those funds in the account until such time as Schroder's right to a set-off was fully resolved.

On September 18, 1984, this Court issued a memorandum decision granting Itec's motion to dismiss Schroder's RICO counterclaim, but denying Itec's motions to dismiss the four other counterclaims against it. At the same time, the Court denied Schroder's motion for partial summary judgment on the breach of contract counterclaim.

On September 21, 1984, the Court heard argument on ONG's motion to dismiss the claims against it for lack of personal jurisdiction, failure to state a claim for relief, and failure to plead fraud with particularity. At oral argument, the parties informed the Court that Schroder had agreed to dismiss its claims against CGIP. The Court reserved decision on ONG's motion.

On August 28, 1984, Schroder again demanded that Itec perform its obligations under the Letter Agreement. Itec failed to do so within thirty days of this demand. In fact, on September 26, Itec expressly repudiated any obligation to purchase the Surplus Note.

On January 21, 1985, Schroder renewed its motion for partial summary judgment on the breach of contract counterclaim. That motion, together with ONG's motions to dismiss, is now before the Court.

## III. *Schroder's Motion for Partial Summary Judgment*

Under New York law, which governs the Letter Agreement (*see* note 1), an action

for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and (4) damages. *See Stratton Group Ltd. v. Sprayregen*, 458 F.Supp. 1216 (S.D.N.Y.1978). The Court has previously stated,

No one questions the existence of a contract. Nor is there a question that the Letter Agreement obligates Itec either to substitute itself or another lender for the ... Note or to purchase at face value the Surplus Note. Also, there is no question that to date Itec has failed to take either of these steps even though Walhof and First Florin have defaulted on the ... Note.

*Bank Itec, N.V. v. J. Henry Schroeder Bank & Trust Co.*, No. 84–0371, slip op. at 10 (S.D.N.Y. Sept. 18, 1984). Itec's performance under the Letter Agreement came due not later than thirty days after the August 26, 1984, date of maturity. Itec has since repudiated its obligations under the Letter Agreement. Left unredressed, Itec's conduct will cause Schroder to suffer substantial damages. Thus Schroder has pleaded and proved every element of a breach of contract claim.

Itec raises three objections to this claim. It first argues that ambiguity in the Letter Agreement raises factual issues that preclude summary judgment. It also attempts to avoid any liability by asserting the defenses of mutual mistake and illegality.[2] Because each of Itec's objections must be resolved, as a matter of law, in Schroder's favor, Schroder's motion for partial summary judgment is granted.

## A. Interpretation of the Contract.

■ Itec contends that a genuine issue of material fact exists with respect to whether its obligation to purchase the Surplus Note is conditioned upon that transaction being in compliance with Dutch law. It argues that the circumstances surrounding the negotiations between Schroder and Itec demonstrate that the parties intended that compliance with Dutch law condition Itec's obligation. Itec implores the Court to deny summary judgment because a genuine issue of material fact remains regarding the state of Dutch law. The Letter Agreement's manifest lack of ambiguity both precludes any consideration of the circumstances surrounding the negotiations and mandates a construction of the contract directly contarary to the one advanced by Itec.

When interpreting a contract, a court must defer to unequivocal language expressing the intention of the parties. *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978). Only if a contract is ambiguous will parole evidence be admitted to aid in its interpretation.[3] *Id.* Courts thus ascertain whether a contract is ambiguous by examining the agreement on its fact without regard to extrinsic evidence. *Id.; Schmidt v. Magnetic Head*

---

**2.** In opposing Schroder's previous motion for partial summary judgment, Itec also emphasized that in December 1983, Schroder had authorized the public auctioning of the Surplus Note. At the December 31, 1983, auction, Itec purchased the Surplus Note for $1,000. Itec claimed that this purchase modified Itec's obligation under the Letter Agreement to purchase the Surplus Note. In its memorandum decision of September 18, 1984, the Court stated, "Still unresolved ... [is] whether Itec's purchase of the Surplus Note is contingent upon Itec's remaining in compliance with the Dutch lending laws ... and ... whether Itec's purchase of the Surplus Note for $1,000, and the December negotiations and agreements relating to that purchase somehow altered Itec's obligations to Schroder." *Bank Itec N.V. v. J. Henry Schroder*

*Bank & Trust Co.*, No. 84–0371 slip op. at 10 (S.D.N.Y. Sept. 18, 1984).

Itec did not discuss the December 1983 purchase of the Surplus Note either in its responsive papers or at oral argument on this motion. The Court takes this silence to indicate that Itec no longer contends that this purchase constitutes a viable defense to Schroder's partial summary judgment motion. Moreover, on reflection, we believe it does not.

**3.** The decision as to whether a contract is ambiguous is for the court. *Zodiac Enterprises, Inc. v. American Broadcasting Co.*, 81 A.D.2d 337, 440 N.Y.S.2d 240, 241 (1st Dep't 1981), *aff'd*, 56 N.Y.d 738, 437 N.E.2d 279, 452 N.Y. S.2d 20 (1982).

*Corp.*, 97 A.D.2d 151, 468 N.Y.S.2d 649, 654 (2d Dep't 1983).

Although it is a rare writing that requires no interpretation, *Benson's Plaza v. Great Atlantic & Pacific Tea Co.*, 44 N.Y.2d 791, 377 N.E.2d 477, 478, 406 N.Y. S.2d 33, 34 (1978), the Letter Agreement is such a writing. It expressly conditions Itec's obligation to assume Walhof's and First Florin's obligation under the Note on compliance with Dutch law. A sentence that follows immediately after a discussion of Itec's obligation to find a substitute lender states:

> The foregoing undertaking of Bank Itec shall be subject to, and be limited by, the provisions of the Wet Toezicht Kredietwezen, as then in effect, or any similar laws, now or hereafter existing, which regulate banks domiciled in the Netherlands, and any rules, regulations, directives or decrees promulgated thereunder, including particularly the rules governing the legal lending limit of the amount loaned to any one Borrower.

Van Der Lugt Affidavit, Exhibit B. The Letter Agreement next discusses Itec's obligation to *purchase* the Surplus Note. That discussion makes no reference whatever to Dutch law. Rather, it provides,

> In the event that the Note cannot be assumed by a substitute lender other than Bank Itec and Bank Itec cannot assume all the rights and obligations under the Note as a result of its then prevailing legal lending limit or for any

other reason whatsoever, Bank Itec agrees to purchase from the Borrower at face value the surplus note....

*Id.*

The meaning is clear. Itec's first obligation is conditioned on compliance with Dutch law; it's second is not. Any other interpretation would stretch the imagination of even the most quixotic reader.[4] "Unless we have reached the point in commercial life where, as in *Alice in Wonderland,* words [d]o not mean what they say," the Letter Agreement must be interpreted in Schroder's favor. *Meinrath v. Singer Co.*, 482 F.Supp. 457, 460 (S.D.N.Y.1979) (Weinfeld, J.), *aff'd without opinion*, 697 F.2d 293 (2d Cir.1982).[5]

## B. Mutual Mistake.

■ Itec asserts that both parties to the Letter Agreement mistakenly believed that the purchase of the Surplus Note would comply with Dutch law. It further contends that rescission of the Letter Agreement and Itec's obligations thereunder is appropriate to remedy the parties' mutual mistake. However, because Itec accepted benefits under the Letter Agreement, it cannot avail itself of this defense.

The defense of mutual mistake is available when a mistake of fact in contracting is both mutual and substantial. *Brauer v. Central Trust Co.* 77 A.D.2d 239, 433 N.Y. S.2d 304, 307 (4th Dep't 1980). Where such a mistake exists, there is an absence of the

---

**4.** In the words of a recent Second Circuit decision relating to the granting of summary judgment in breach of contract actions, the "terms of the agreement are 'wholly unambiguous.'" *Wards Co. v. Stamford Ridgeway Associates and Trim Fashions, Inc.*, 761 F.2d 117, 120 (2d Cir. 1985) (quoting *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).

**5.** In an earlier memorandum decision denying the plaintiff's motion for summary judgment on the breach of contract claim, the Court indicated that an issue of fact *might* remain as to whether the purchase of the Surplus Note was conditioned on compliance with Dutch law. *See Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.*, No. 84–0371, slip op. at 10–11 (S.D. N.Y. Sept. 18, 1984). After careful considera-

tion, the Court has decided to adopt what we take to be the only reasonable interpretation of the Letter Agreement.

It would appear that the purchase of the Surplus Note, following default, was likely to occur only in the event of a financial disaster. To leave Itec's obligations, and Schroder's rights, subject to the imponderables of compliance with Dutch law, would have created an intentional uncertainty in the parties respective positions. The fact that the prior provision concerning a substitute lender was subject to the Netherland's legal lending limits necessitated an alternate which was not so subject. Since this explanation has factual overtones, we do not rely on it. *See Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975).

requisite meeting of the minds and relief may be appropriate. *Id.*

Both Itec and Schroder presently maintain that they signed the Letter Agreement thinking that Itec's obligation to purchase the Surplus Note did not, and the actual purchase would not, violate Dutch law.[6] Whether they were mistaken turns on Dutch law. Issues of Dutch law are genuine issues of material fact. *See Banco national de Cuba v. Sabbatino*, 27 F.R.D. 255, 257 (S.D.N.Y.1961) (mistake about foreign law is a mistake of fact); *Huber v. Huber*, 26 Misc.2d 539, 209 N.Y.S.2d 637, 640 (Sup.Ct.1960) (same). Assuming the parties *were* mistaken, and the transaction is illegal, Schroder is, nevertheless, entitled to summary judgment on Itec's defense of mutual mistake.

A party who accepts benefits under a contract is estopped from seeking rescission or other relief from the terms of that contract. *Svenska Taendsticks Fabrik Aktiebolaget v. Bankers Trust Co.*, 268 N.Y. 73, 196 N.E. 748 (1935); *City of Buffalo v. Balcom*, 134 N.Y. 532, 37 N.E. 7 (1892); *Otis Elevator Co. v. Heggie Realty Co.*, 107 Misc.2d 67, 437 N.Y.S.2d 832, 833 (Sup.Ct.App.Term 1st Dep't 1980). An exception is sometimes made if the parties have not greatly altered or changed their positions, so that rescission can return them to the positions they occupied prior to entering into an agreement. *D'Antoni v. Goff*, 52 A.D.2d 973, 383 N.Y.S.2d 117, 119 (3d Dep't 1976) (land sale purchase could be easily rescinded); *Labasin v. President Realty Holding Corp.*, 14 A.D.2d 551, 218 N.Y.S.2d 234 (2d Dep't 1961) (same). However, the New York courts will not rescind a contract if rescission cannot restore the *status quo*. *Holdeen v. Rinaldo*, 28 A.D.2d 947, 281 N.Y.S.2d 657, 659 (3d Dep't 1967).

The parties agree that Itec's outstanding loans to Walhof and First Florin were reduced by $3 million pursuant to the Letter Agreement. Itec benefitted from that

agreement and cannot now rescind it, particularly since, as it acknowledges, rescission cannot return the parties to the positions they occupied prior to the agreement. The defense of mutual mistake is, therefore, unavailing.

### C. Illegality.

According to Itec, Dutch law should determine the legality and enforceability of its obligation to purchase the Surplus Note. It further argues that factual issues persist as to whether Itec's obligation to purchase the Surplus Note is illegal and, therefore, unenforceable under that law. Itec's argument is misplaced. New York law applies in this context and mandates enforcement of Itec's obligation.

#### 1. The Applicable Law

■ A court sitting in a diversity case must apply the choice of law rules of the state in which it sits. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties disagree as to the effectiveness under New York law of the choice of law clause in the Letter Agreement which states, "This agreement shall be governed by and interpreted in accordance with the laws of New York," Van Der Lugt Affidavit, Exhibit B. Schroder contends that a choice of law clause in a contract will control if the chosen forum has some significant contact with the contract and if the fundamental policy of the otherwise applicable law is not vitiated. It points to a substantial body of case law that supports its proposition. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 793 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Hawes Office Systems, Inc. v. Wang Laboratories, Inc.*, 537 F.Supp. 939, 942 (E.D.N.Y.1982); *CBS, Inc. v. Tucker*, 412 F.Supp. 1222, 1226 (S.D.N.Y. 1976); *B.M. Heede, Inc. v. West India Machinery and Supply Co.*, 272 F.Supp. 236, 240–41 (S.D.N.Y.1967); *Levey v. Saphier*,

---

**6.** Both parties attempt to impute knowledge of the relevant Dutch banking regulations to the other, but neither contends that the other understood the pertinent provisions, if those provisions mean what Itec maintains they mean.

83 Misc.2d 146, 370 N.Y.S.2d 808, 809 (Sup. Ct.1975); *Restatement (Second) of Conflict of Laws* § 187 (1971). Itec relies on several cases that determine the applicable law by weighing the forum related contacts without regard to the parties' choice. *See Keystone Leasing Corp. v. People's Protective Life Insurance Co.*, 514 F.Supp. 841, 847 (E.D.N.Y.1981); *Haag v. Barnes,* 9 N.Y.2d 554, 175 N.E.2d 441, 443, 216 N.Y.S.2d 65, 68–69 (1961) ("The more modern view is that "the courts . . . lay emphasis . . . upon the law of the place 'which has the most significant contacts with the matter in dispute.'"). These cases, according to Itec, state the correct choice of law rule.

Not only does the Restatement and the substantial weight of the case law support Schroder's position, but fundamental policies underlying contract law also counsel its adoption.

> Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby. In this way, certainty and predictability of result are most likely to be secured. Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations.

*Restatement (Second) of Conflict of Laws* § 187 comment e (1971). Absent special circumstances, the parties' choice of New York law must control.

In this case, Itec and Schroder clearly expressed their intention that the law of New York control the interpretation and enforcement of their contract. In addition,

New York had significant contacts with the transactions at issue. Schroder is a New York corporation; it executed the Letter Agreement in New York; and fulfilled its obligations under the contract by transferring monies from an account in New York. Together with the choice of law clause, these significant contacts require the application of New York law. *See B.M. Heede, Inc. v. West India Machinery and Supply Co.*, *supra,* 272 F.Supp. at 241 (New York law applied because the plaintiff was a New York corporation and the agreement was partially executed in New York).

That the application of Dutch law might alter the substantive outcome of this litigation does not alter this conclusion. Judges in this district have not hesitated to apply New York law when the law of an alternative forum would render a contract unenforceable. In *B.M. Heede, Inc. v. West India Machinery and Supply Co., supra,* Judge Tenney applied New York law notwithstanding a Puerto Rican statute that would have voided part of the contract. *Id.* at 239. Although Puerto Rico had the most significant contacts with the transaction, Judge Tenney accepted the parties' designation of the law of New York as the applicable law. This result corresponds to the general predilection of the New York courts to apply the law that will uphold a contract. *Birger v. Tuner,* 104 Misc.2d 63, 427 N.Y.S.2d 904, 908 (Civ.Ct.1980). According to Itec, applying Dutch law in this case would do just the opposite—it would void the contract. The Court finds that the New York courts would apply the law of New York to determine the legality and enforceability of Itec's obligations under the Letter Agreement.[7]

### 2. The Effect of the Dutch Bank Lending Limits.

The enforceability of an obligation that violates a foreign state's lending limits is a

---

**7.** The New York State legislature recently enacted a provision giving a choice of law clause designating the law of New York binding effect regardless of whether the agreement bears a reasonable relation to New York. *See* N.Y.Gen. Oblig.Law § 5–1401(1) (1984 N.Y.Laws Ch. 421). The provision, which applies only to certain

substantial contracts, evinces New York's continued willingness to give effect to the intention of parties, like Schroder and Itec who engage sophisticated counsel to draft an important agreement. *See Bellefonte Re-Insurance Co. v. Argonaut Insurance Co.,* 581 F.Supp. 241, 243 (S.D.N.Y.1984).

question of first impression for a court applying New York law. Although the New York courts have considered the enforceability of loan agreements that violate federal bank lending limits, *Duncomb v. New York, Housatonic & Northern Railroad Co.*, 84 N.Y. 190, 205 (1881); *Slade v. Bennett*, 133 A.D. 666, 118 N.Y.S. 278, 279–80 (1st Dep't 1909); *Washington Heights Federal Savings and Loan Association v. Brooklyn Fur Storage Corp.*, 5 Misc.2d 997, 161 N.Y.S.2d 674, 676 (Sup.Ct. 1957), no New York court has considered the enforceability of an obligation that violates a state or foreign lending limit. The state and federal courts that *have* confronted such problems have universally applied a single guiding principle: one without knowledge of a statutory lending limit can enforce an obligation which violates that limit. *First American National Bank v. Alcorn, Inc.*, 361 So.2d 481 (Miss.1978) (beneficiary of letter of credit agreement who did not know that that agreement violated the maker's lending limit could enforce maker's obligation under the letter of credit); *Bank of College View v. Nelson*, 106 Neb. 129, 183 N.W. 100 (1921) (borrower who did not know of a bank's loan limit could enforce the bank's promise to lend it a sum exceeding its legal limit). In addition, a borrower who knows that a lending limit exists can enforce an obligation that it does not know will exceed that limit. *National Farmers Organization, Inc. v. Kinsley Bank*, 731 F.2d 1464, 1469 (10th Cir.1984).

Whenever the validity of an obligation that violates a bank lending limit has been questioned, the knowledge of the parties has been dispositive. For example, in *Jaynes v. First National Bank*, 236 F.2d 258 (9th Cir.1956), a court that refused to enforce a bank's loan commitment to its cashier stated,

> If this were the plight of an innocent borrower who had assumed the bank knew what it was doing when it made a

bargain to finance the house ..., we could at least record our sympathy. But here we had a bank cashier who knew the amount of the bank's capital and surplus. Presumably, he had heard of the ten percent [lending] limitation.

*Id.* at 260. Although not binding on the New York courts, this approach is both logical and persuasive. One who does not and should not know of an improper transaction cannot be victimized by another's wrongdoing. *See National Farmers Organization v. Kinsley Bank, supra*, 731 F.2d at 1469.

Moreover, no variable other than the knowledge of the parties explains the bank lending limit cases. Thus, it apparently matters not whether the person seeking to enforce or avoid an obligation is a borrower, a lender, or a guarantor. *Compare National Farmers' Organization, Inc. v. Kinsley Bank, supra* (lender must fulfill its obligation to borrower) *with Dove Creek State Bank v. Lawrence Warehouse Co.*, 157 Colo. 263, 402 P.2d 369 (1965) (en banc) (lender excused). Thus, Schroder's status as a borrower, a guarantor, a lender, or some hybrid of the three is immaterial. Schroder's knowledge is dispositive.

■ The facts in that regard are undisputed. Although Schroder knew of the Dutch lending limits when it executed the Letter Agreement, it did not know that Itec's agreement to purchase the Surplus Note, or the actual purchase thereof, would (or could) violate those limits.[8] In fact, before signing the Letter Agreement, Schroder received a letter from a Dutch attorney opining that the Surplus Note obligation did *not* violate applicable Dutch lending law.

Schroder's ignorance leaves the Court no choice but to enforce Itec's obligation to purchase the Surplus Note, even if that purchase violates the Dutch Credit Control

---

**8.** Because Schroder's state of mind is undisputed, to presume that Schroder knew of the lending limit violation would be improper. Indeed, were the Court to make a presumption, it would be that Itec, a Dutch bank, knew of the problems relating to the Surplus Note obligation.

Act.[9] Itec's defense of illegality is insufficient as a matter of law.[10]

Nor does equity support Itec's position. Itec asserts that in August 1982, it mistakenly construed the Dutch regulations governing its legal lending limit. Itec was still unaware of the proper application of the regulations in August 1983, when it asked Schroder to extend the Letter Agreement for another year. In fact, Itec asserts, it only "discovered" the problem when Schroder moved for summary judgment in May 1984. Itec claims to have discovered the truth by telephoning the Dutch Central Bank. Eisman Affidavit ¶¶ 7–8. Why Itec waited two years to make this telephone call is a mystery. Itec's unexplained ignorance supports our decision.

A court may grant summary judgment only if the memoranda and supporting materials before it disclose "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although summary judgment is often inappropriate in a breach of contract case, *see Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975), it is sometimes proper, *see R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729 (2d Cir.1984). Few factual issues remain unresolved in this dispute. Those that remain do not prevent the Court from disposing of Itec's defenses as a matter of law. Schroder is, therefore, entitled to summary judgment on its breach of contract counterclaim.

### IV. *ONG's Motion to Dismiss*

At oral argument, Schroder indicated that a favorable decision on its motion for summary judgment would moot its claim against ONG. Schroder would then be unable to establish any damages flowing from ONG's conduct. Accepting Schroder's representation that its claims against ONG are no longer viable, the Court need not decide ONG's motion.

### V. *Conclusion*

Schroder's motion for partial summary judgment is granted. Schroder should submit an order withdrawing its claims against ONG and any other claims that are mooted by this decision. The Court need not decide ONG's motion to dismiss the claims against it.

SO ORDERED.

---

9. Itec contends that the Dutch Credit Control Act, the "Wet Toezicht Kredietwezen," voids any term of an agreement that violates any of its provisions. Although that allegation must be taken as true on this summary judgment motion, it is not dispositive. In the past, the New York courts have looked to the language and intent behind the particular lending limit statute at issue to determine whether an obligation that violates its prohibitions is void. For example, in *Duncomb v. New York, Housatonic & Northern Railroad Co.*, 88 N.Y. 190 (1881), New York's Court of Appeals held that the federal bank lending limit statute did not void loans that violated its provisions. More recently, the federal and state courts have looked less to statutory language and intent and more to the circumstances of the particular transaction. For example, in *First American National Bank of Iuka v. Alcorn*, 361 So.2d 481 (Miss.1978), which involved the federal statute, the statutory intent was not dispositive. *See also Jaynes v. First National Bank of Ketchikan, Alaska*, 236 F.2d 258 (9th Cir.1956). The language of the Dutch Credit Control Act will not, by itself, prevent the Court from awarding summary judgment in Schroder's favor.

10. Although "summary judgment is ordinarily inappropriate where an individual's ... state of mind [is] implicated," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), it is appropriate when, as here, a party's state of mind is not a contested issue. *Id.*