OPINION OF THE COURT
Martin Schoenfeld, J.
Plaintiff Maria del Carmen Onrubia de Beeck, a citizen of Peru, filed a summons and complaint in February 2006[1] seeking a declaratory judgment that she is the owner of the bearer shares of Williamsport Capital, Ltd., a British Virgin Islands company, and as such, that she controls its Israeli Discount Bank account, located in New York. She also brought claims against her former psychologist, defendant Gaspar Roberto Lopez Costa, a citizen of Argentina, for fraud, breach of fiduciary duty, unjust enrichment, constructive trust and an accounting seeking over $10 million in damages and interest. She has since discontinued the constructive trust and accounting claims.
Over the last six years, there has been much discovery and several motions decided in this action. The case was slated for trial in the summer of 2011. However, in July of that year the court granted a motion on behalf of defendant’s attorneys, to be relieved of their duties as counsel because they were owed in excess of $140,000. In the same order the court directed that the case proceed to trial after a 30-day stay. Defendant failed to appear on the date scheduled for the trial to begin, September 12, 2011. As a result, defendant was defaulted by the Trial Assignment Part judge, and the case was transferred to IAS Part 28 for inquest.
Plaintiff now asks this court for a declaratory judgment regarding ownership of the Williamsport Capital, Ltd. bearer shares and its Israel Discount Bank account; a judgment regard *350 ing plaintiffs claims against defendant for fraud, breach of fiduciary duty and unjust enrichment; and an assessment of damages thereof in the amount of $7,498,562 plus interest. In support, plaintiff has filed numerous documents, including several expert attorneys’ affidavits concerning the relevant laws of Argentina, Peru and the British Virgin Islands, as well as affidavits from an Argentinian psychologist and ethicist, a psychiatrist who examined plaintiff, a forensic accountant and an Argentinian public accountant.
The court has also received several letters via Federal Express written in Spanish from the now pro se defendant, who appears to still be living in Argentina. Along with these letters, defendant has enclosed attempted English translations, apparently made by using a computer program. As best the court can decipher from the imprecise and often unintelligible translations, defendant indicates that he does not have the means to travel to New York, but appears to be contesting plaintiff’s claims. However, other than by these letters, defendant has not filed any legal papers regarding this inquest proceeding.
The case is now slated for a hearing. Prior to holding such hearing, however, there are several matters that should be addressed. First, the court must consider whether there needs to be an evidentiary hearing with regard to the request for a declaratory judgment. Second, because ownership of the Williamsport Capital, Ltd. bearer shares implicates the laws of Argentina, New York, and the British Virgin Islands, the court must determine which law to apply. Third, the court should address whether plaintiff has made out a case with regard to her causes of action for fraud, unjust enrichment, and breach of fiduciary duty. In doing so, there is a need to decide the choice of law issues that are raised by each of these causes of action. Finally, with regard to these claims, the court must review the evidence presented in the papers concerning damages and determine, pursuant to CPLR 3215, what, if any, damages, may have been proved on the papers alone.
Background[2]
Plaintiff is a member of the Romero family which is apparently a well-known wealthy family in Peru. She is married and has four adult children, Mari, Willy, Javier and Gerardo. Defendant, as noted above, is an Argentinian citizen and a *351 psychotherapist. In 1986, while living in Peru, he began treating plaintiff and her husband, as well as their then teenage daughter Mari and their son Gerardo. In 1988, defendant moved back to Buenos Aires. Soon thereafter he convinced plaintiff, and her son Gerardo, to follow him to Argentina to continue treatment. By that time, Mari was in college in the United States.
In Argentina, plaintiff visited defendant five days a week for two hours a day for therapy. Gerardo went three days a week. Plaintiffs other children were also sometimes treated by defendant when visiting Buenos Aires. During treatment, defendant emphasized that each member of the family not tell the other about what was happening in therapy. As such, plaintiffs family was kept ignorant of her complicated relationship with defendant.
Once plaintiff moved to Argentina, she claims that defendant began to control most aspects of her life. Defendant told plaintiff that she was sexually repressed. He then, under the guise of therapy, began having intercourse with her once a week on the floor of his office. Years later plaintiff learned that defendant also at some point had sex with her daughter, Mari.
In addition, defendant began asserting financial control over plaintiff. Plaintiff had confided in defendant that she believed her cousins, who ran the family company, were unfair to her with regard to awarding dividends. By the early 1990s, defendant was encouraging plaintiff to allow him to “invest” her money, as a way of asserting her independence from her wealthy family. Plaintiff contends that at defendant’s direction, she gave him millions of dollars between 1992 and 2004 with the belief that he was investing it on her behalf, and that she would receive it back, plus a return on the investment. However, plaintiff claims to have received only a small portion of this money back. This is discussed in more detail below.
Plaintiff claims she provided money to defendant in several ways. Much of it she gave to him in the form of “investment” checks. These checks were paid in increments of $10,000, $12,000 or $13,000. Plaintiff signed, dated and wrote the amount on these checks, but left the payee portion blank. She provided these checks to defendant multiple times throughout any given month. Apparently, defendant cashed many of these checks in money exchange houses in South America and in the United States, including the Beacon Hill Service Corporation in New York. That company was later the subject of a criminal *352 investigation for money laundering and for transmitting funds without a license. Plaintiff claims that between 1992 and 2004, she wrote checks to defendant for “investments” in the amount of $7,579,500.
Plaintiff also gave defendant bimonthly checks in the amount of $20,000 to $30,000 as his fees for therapy services. From 1992 to 2004, she calculates that she paid defendant $1,958,650 for his services.
In addition, most months plaintiff claims that she wrote personal checks of $15,000 to a blank payee which defendant or his assistant helped her cash. This money was supposed to be used for her family’s personal expenses. Plaintiff estimates, however, that she gave 20% of this cash to defendant to use as additional investment money. She estimates that she gave defendant $243,600 in cash from these personal expenses between 1995 and 2004.
To support her damage claims, plaintiff offers the expert financial report of Christopher A. Welde, dated September 21, 2007. Mr. Welde is a public accountant who works in the field of forensic accounting. He reviewed bank transaction statements from three bank accounts in plaintiffs name, cancelled checks from these accounts, and transaction statements from two of defendant’s accounts. Mr. Welde did not receive any bank information for the years 1992 to 1994 and, therefore, did not provide any figures for that period. Moreover, although he offers an estimation for the years 1995 to 2004, he did not receive any cancelled checks for the years 1998 and 1999, which he calls the “gap years.”
For the years 1995 to 1997, and 2000 to 2004, Mr. Welde categorized the cancelled checks that he was given to review as either “investment” checks, “personal funds,” or “professional fees.” This was based upon information he received from plaintiffs attorneys, and from reviewing the transcripts of both plaintiff’s and defendant’s depositions. He concludes that plaintiff provided a total of $4,997,000 to defendant for investments during that time, paid $1,358,150 in professional fees, and wrote checks for personal expenses in the amount of $1,020,000. For the “gap years” of 1998 and 1999, where cancelled checks were not provided, Mr. Welde used his “professional judgment” extrapolating from the amount of money that went into defendant’s bank accounts and using ratios of expected investments, professional fees and personal fees based on the other years to estimate the amount plaintiff paid to de *353 fendant as such: investments $1,083,000; professional fees $301,000 and personal expenses $198,000.
It should be noted that plaintiffs damage request includes the amounts discussed by Mr. Welde, for all of the years, including the “gap years,” and for the years 1992 to 1994, for which Mr. Welde provides no analysis. Plaintiff estimates that in these years she gave defendant $500,000 per year in investments and $150,000 in professional fees. She provides no documentary evidence, only her affidavit, to support these amounts.
Plaintiff also states that in about 1992 she transferred $500,000 of her money to a bank account controlled by defendant, which he used to make additional investments. Plaintiff, however, does not provide documentary proof of this transaction. In fact, she notes that she does not have records of these accounts and believes that the bank no longer has such records either. In this regard, the only evidence provided is the opening papers of an account in her name which apparently uses defendant’s Argentina address, together with a check written and signed by plaintiff to defendant in the amount of $936.
Plaintiff says that in 1993 at the behest of defendant, she sold two properties in Peru. She then turned over the proceeds, in excess of $500,000, to defendant, which he used to form certain development companies. Although plaintiff provides the deeds of sale for these properties, indicating the amount of money the properties were sold for, she presents no documentary evidence showing that the proceeds were transferred to defendant.
In 2001 defendant formed Williamsport Capital, Ltd. (Williamsport), a company incorporated in the British Virgin Islands (BVI), and established an associated bank account at the Israel Discount Bank (IDB) in New York. According to plaintiff, the IDB account has over $2.5 million in it. Plaintiff believes most of this money was transferred into the account through money transmitters.[3] Plaintiff submits an affidavit from José Luis Equria dated December 13, 2011. He is an Argentinian accountant who, after examining defendant’s tax returns, opines that according to those tax returns defendant did not have sufficient assets to have funded this account himself. Plaintiff believes that the account was funded with some of the money she provided to defendant over the years.
*354 Plaintiff offsets her damages request with certain monies she received back from defendant. She explains that beginning in late 2003, as a way to hide assets from his estranged wife, defendant began giving plaintiff cash from her “investment” checks rather than keeping it himself. He instructed plaintiff to hold the money, which she did in a beige cosmetic bag. Plaintiff states that she accumulated $430,000 in this bag, money which she did not return to defendant. Plaintiff also claims that defendant deeded to her four apartments, built by companies that he had formed with the use of her money. She, in turn, gave these apartments to one of each of her children, all of whom eventually sold them. She provides an affidavit from her son, Javier, outlining the amount of money for which each property was sold, contending that the properties sold for a total of $290,154. Both of these amounts are subtracted by plaintiff from the total damages requested.
In addition, plaintiff claims that defendant visited her at her Argentinian apartment in early 2004. At that time, he gave her a bag containing the bearer shares for Williamsport Capital, checkbooks for its IDB account, a bank statement for that account, as well as a suitcase containing $30,000 in cash, telling her: “Carmen this is yours.” Plaintiff subtracts this $30,000 as well as the over $2 million in the Williamsport IDB account in calculating her total damage figure.
It appears that plaintiff finally became suspicious of defendant when, in November 2004, he attempted to have her sign a backdated document meant to establish a $2 million debt, collateralized by shares of a construction company that he had set up using her money. She refused to sign the document. Soon thereafter, plaintiff discovered from her daughter Mari that she too had sexual intercourse with defendant. Plaintiff then told her children about all the money she had given to defendant over the years. After a family meeting, they consulted a lawyer. Subsequently, plaintiff, as possessor of the Williamsport bearer shares, attempted to remove defendant as its president and sole shareholder.
In January 2005, Mari, who, as noted, was then living in the United States, took the bearer shares to IDB in New York to show that she and plaintiff were now the officers, rightfully in control of Williamsport and its bank account. However, instead of acknowledging their control, the bank froze the account, stating that defendant claimed the bearer shares had been stolen. IDB informed plaintiff that she would need to obtain an order from a New York court to establish her ownership of the shares.
*355 Discussion
Default Declaratory Judgment
1. Need for a Hearing
In seeking a declaratory judgment, plaintiff requests that this court find that she, as possessor of the Williamsport bearer shares, is the rightful owner and, thus, entitled to control the IDE account. Generally, once a defendant has defaulted, a court may enter a default judgment based solely upon the pleadings and affidavits setting forth how damages are computed, without need for a hearing. However, New York courts “rarely, if ever” grant declaratory judgments on default “with no inquiry by the court as to the merits.” (Tanenbaum v Allstate Ins. Co., 66 AD2d 683, 684 [1st Dept 1978].) Default declaratory judgments “ ‘will not be granted on the default and pleadings alone’ ” but require that the “ ‘plaintiff establish a right to a declaration against... a defendant.’ ” (Levy v Blue Cross & Blue Shield of Greater N.Y., 124 AD2d 900, 902 [3d Dept 1986], quoting National Sur. Corp. v Peccichio, 48 Misc 2d 77, 78 [Sup Ct, Albany County 1965]; see Continental Ins. Co. v Huff Enters. Inc., 2009 WL 3756630, *5, 2009 US Dist LEXIS 104126, *14-15 [ED NY, Nov. 6, 2009, No. 07 cv 3821 (NGG)].)
The present case is obviously complex, and there is a substantial amount of money at stake. In addition, as previously noted, the defaulting defendant, who lives out of the country, has sent several letters to the court indicating his interest in the outcome of this proceeding. In considering all the circumstances herein and reviewing the law, this court finds that the holding of a hearing at which plaintiff has the burden of establishing “a right to a declaration” that she owns the Williamsport bearer shares is required.
2. Choice of Law
Before this court can hold a hearing to decide if plaintiff controls the Williamsport bearer shares, it must first be determined which jurisdiction’s law should apply: (1) the British Virgin Islands, where Williamsport was incorporated and the bearer shares were issued; (2) Argentina, where plaintiff received the bearer shares; or (3) New York, where William-sport’s IDB account is located.
The question is unique because bearer shares are not used in either New York or Argentina. Thus, the rules regarding ownership of such shares are not addressed directly by the laws of either of these jurisdictions. In determining questions of *356 the “incidents of shares,” New York courts generally look to the laws of the state of incorporation. (Levey v Saphier, 83 Misc 2d 146, 149 [Sup Ct, Nassau County 1975]; see Kuyper v MGM/UA Entertainment Co., 1986 WL 13466, *2, 1986 US Dist LEXIS 17505, *5-6 [SD NY, Nov. 20 1986, No. 86 Civ. 1780 (RLC)]; UCC § 8-110; cf. Sweeney, Cohn, Stahl & Vaccaro v Kane, 6 AD3d 72, 75 [2d Dept 2004].) Only where there are more significant contacts in New York than in the state of incorporation would the court consider applying New York law. (See Levey, 83 Misc 2d at 149.) Here, the fact that the Williamsport IDB account is in New York is not a significant enough contact to eschew the laws of the incorporating country — BVI—especially where New York law does not even directly address the issues of bearer share ownership. (Cf. Valencia Bartels de Nunez v Valencia Bartels, 684 So 2d 1001, 1004 [La App 1st Cir 1997] [finding use of foreign law appropriate where only state contact was presence of corporate funds].)
Furthermore, according to an opinion letter dated November 23, 2010, submitted by Hernán and Juan Martin Odriozola, Argentinian lawyers, on behalf of plaintiff (the credibility of which this court has no reason to question), this analysis holds true under Argentinian law, as well, where matters involving ownership of corporate shares are generally governed by the laws of the place of incorporation. (Supplemental affirmation of Kathleen M. Kundar dated Dec. 19, 2011, exhibit 1 at 5 [English translation].) Thus, the laws of both New York and Argentina point to using BVI law to determine the outcome of this case with respect to ownership of the Williamsport shares.
Further strengthening this proposition is the fact that in contrast to New York and Argentinian law, BVI allows its country’s companies to issue bearer shares. In fact, BVI, according to plaintiffs papers, recently enacted laws that place explicit restrictions on how bearer shares issued by its companies may be held and transferred. Thus, BVI clearly has a strong interest in regulating its companies as manifested by these new rules. Accordingly, this court will look to the laws of BVI in deciding the declaratory judgment matter.
In this regard it should be noted that plaintiff has provided the court with the affidavit of Michael Fay dated September 21, 2007, an expert in BVI corporate law. In his affidavit, Mr. Fay, a BVI attorney, explains that at the time Williamsport was incorporated in 2001, there was a legal presumption that the possessor of bearer shares was the owner of those shares. *357 However, in 2004, BVI adopted the Business Companies Act, which, along with amendments to the act in the years that followed, changed certain requirements for bearer share companies. Among other things, the new law essentially requires bearer shares to be held by a recognized or authorized custodian. As a result of this requirement, the law no longer presumes that the possessor of such shares is the owner. Plaintiffs expert opines that this presumption, nevertheless, remains for shares issued prior to enactment of the new law for a “grandfathered bearer share company” such as Williamsport. However, he cites to no authority for this proposition. Further, since the time of his affidavit in 2007, specific rules requiring that bearer shares issued prior to the act be deposited with a custodian, or converted to or exchanged for registered shares have come into effect. Apparently, the consequence of failing to do so includes immobilization of the shares. In light of these circumstances, plaintiff must either submit an updated expert affidavit or, preferably, provide a witness at the hearing to testify how the new changes to BVI law affect ownership of the bearer shares in question.
Default Judgment for Fraud, Unjust Enrichment, and Breach of Fiduciary Duty
Plaintiff seeks judgment, on default, against defendant regarding her claims of fraud, breach of fiduciary duty and unjust enrichment. Under CPLR 3215, the court may grant a default judgment where a party fails to appear. All that is required is that plaintiff “seeking a default judgment . . . must present prima facie proof of a cause of action.” (Silberstein v Presbyterian Hosp. in City of N.Y., 95 AD2d 773, 774 [2d Dept 1983].) “The standard of proof is not stringent, amounting only to some firsthand confirmation of the facts.” (Feffer v Malpeso, 210 AD2d 60, 61 [1st Dept 1994].) A “mere verified complaint” is often enough to satisfy this burden of proof. (State of New York v Williams, 26 Misc 3d 743, 751 [Sup Ct, Albany County 2009].) A defaulting defendant “admits all factual allegations of the complaint and all reasonable inferences therefrom,” however the “legal conclusions” are “reserved for the court’s determination.” (Silberstein, 95 AD2d at 774.)
What complicates matters in the present case is that although plaintiff brought this case in New York County (presumably because the IDB account is located here), the events relevant to these claims occurred in Argentina. Therefore, before this court can grant judgment, it must determine whether to apply the laws of New York or Argentina.
*358 It is well established that the “first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.” (Matter of Allstate Ins. Co. [Stolarz — New Jersey Mfrs. Ins. Co.], 81 NY2d 219, 223 [1993].) Where no conflict exists, “the law of the forum state where the action is being tried should apply.” (SNS Bank v Citibank, 7 AD3d 352, 354 [1st Dept 2004]; see Elson v Defren, 283 AD2d 109, 114 [1st Dept 2001] [“Where no conflict exists . . . there is no reason to engage in a choice of law analysis”].) A conflict exists if there are “relevant substantive differences that could have a significant impact on the outcome of the case.” (Finance One Pub. Co. Ltd. v Lehman Bros. Special Fin., Inc., 414 F3d 325, 332 [2d Cir 2005]; see also Commercial Union Ins. Co. v Flagship Mar. Servs., Inc., 190 F3d 26, 30 [2d Cir 1999].)
Here, as discussed below, there is no “meaningful conflict” between New York’s and Argentina’s laws of fraud, unjust enrichment, or fiduciary duty which would have a substantive impact on this case. Thus, the court will apply New York law.
1. Fraud
Under New York law, the elements of a prima facie case for fraud are: “(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to plaintiff.” (Crigger v Fahnestock & Co., Inc., 443 F3d 230, 234 [2d Cir 2006] [citation omitted]; see Ross v Louise Wise Servs., Inc., 8 NY3d 478, 488 [2007].) In New York, a plaintiff who proves these elements of fraud may only collect pecuniary loss damages, which constitutes her “out-of-pocket” losses. (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]; 164 Mulberry St. Corp. v Columbia Univ., 4 AD3d 49, 60 [1st Dept 2004].)
According to the affidavit dated July 6, 2011 submitted by plaintiffs expert Hernán Odriozola, an experienced Argentinian lawyer, fraud under Argentina’s civil law is defined as a “willful misleading not attributable to the victim” which causes damage to the victim. “[T]he plaintiff who seeks compensation for damage [for fraud] has to demonstrate I) that he effectively suffered those damages and ii) that the defendant act[ed] fraudulently.” (Aff of Hernan Odriozola at 4, 5.)
Fraud under New York law requires not only intent but reliance by plaintiff, something apparently not contemplated by Argentine law. Nevertheless, under the circumstances of this *359 case, there are no “relevant substantive differences” in the law that affect the outcome here. Even under New York’s more rigid standard, plaintiff has made out her prima facie case for a default judgment with regard to so called “investment” money-given to defendant. Over the years, defendant was given millions of dollars by plaintiff under the guise that he was investing it for her so that she could achieve independence from her wealthy family. As her psychologist, he used his influence over her to intentionally mislead her into thinking that he was investing the money she gave him for her benefit. Plaintiff relied on defendant’s fraudulent representations and as a result lost millions of dollars. Thus, New York law should apply here. Under that law a default judgment for fraud with regard to plaintiffs so-called investments is appropriate, for which she is entitled to recover her pecuniary losses.
2. Unjust Enrichment
A case for unjust enrichment is made under New York law where “ ‘a benefit was bestowed ... by plaintiffs and that defendants will obtain such benefit without adequately compensating plaintiffs therefor.’ ” (Wiener v Lazard, Freres & Co., 241 AD2d 114, 119 [1st Dept 1998], quoting Tarrytown House Condominiums v Hainje, 161 AD2d 310, 313 [1st Dept 1990].) Similarly, under Argentine law, a plaintiff has a cause of action for unjust enrichment where there is shown
“i) the enrichment of one of the parties; ii) the impoverishment of the other party, who seeks the restitution of his assets to the original state of affairs; iii) that the impoverishment of a party is due to the unjust enrichment of the other; iv) absence of a legitimate cause for the enrichment of the relevant party.” (Odriozola aff at 11.)
Again, there is no substantive difference in the laws of New York and Argentina concerning unjust enrichment that would affect this case. Thus, the court will apply New York law.
Here, plaintiff has made out a prima facie case that defendant was unjustly enriched when he received money for “investments” from plaintiff. “It is well settled that ‘[t]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.’ ” (Sperry v Crompton Corp., 8 NY3d 204, 215 [2007], quoting Paramount Film Distrib. Corp. v State of New York, 30 NY2d 415, 421 [1972], cert denied 414 US 829 [1973]; see Dragon Inv. Co. II *360 LLC v Shanahan, 49 AD3d 403, 405 [1st Dept 2008].) As discussed above, over the years plaintiff gave defendant millions of dollars believing that he was investing this money on her behalf. Instead, defendant used that money for his own personal gain, only giving plaintiff a fraction of the money back, and only as a means of hiding his assets from his estranged wife. Allowing defendant to keep the money he received from plaintiff for her “investments” would fly in the face of both equity and good conscience.
Plaintiff also argues that defendant was unjustly enriched by having taken her money for therapy fees. However, plaintiff has not provided any relevant case law supporting her assertion that professional fees can be recovered under an unjust enrichment theory. Plaintiff may have a valid return of fees claim for breach of fiduciary duty, as discussed below, or a damage claim for malpractice, defendant psychologist having a sexual relationship with his patient. (See Dupree v Giugliano, 20 NY3d 921 [2012].) The court believes, however, that without supportive authority, it would be inappropriate to stretch the law of unjust enrichment to cover the therapy fees.
Thus, the court grants the default judgment on the claim of unjust enrichment as it applies to the money plaintiff gave to defendant for investments, but denies it with regard to the fees plaintiff paid for defendant’s psychiatric services.
3. Breach of Fiduciary Duty
Under New York law, the elements of breach of fiduciary duty are: “the existence of a fiduciary relationship [between plaintiff and defendant], misconduct by the defendant, and damages that were directly caused by the defendant’s misconduct.” (Kurtzman v Bergstol, 40 AD3d 588, 590 [2d Dept 2007] [citation omitted].) To establish a fiduciary relationship, plaintiff must show that the defendant was “ ‘under a duty to act for or to give advice for the benefit’ ” of the plaintiff “ ‘upon matters within the scope of the relation.’ ” (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005], quoting Restatement [Second] of Torts § 874, Comment a.) This relationship is “necessarily fact-specific, [and] is grounded in a higher level of trust than normally present in the marketplace between those involved in arm’s length business transactions.” (Id., citing Northeast Gen. Corp. v Wellington Adv., 82 NY2d 158, 162 [1993].)
Similarly, under Argentine law, a plaintiff must prove “the existence of the fiduciary duty and its breach by the defendant”; that the defendant should have but did not act within the limits *361 of the fiduciary relationship; and that as a result plaintiff suffered “actual and specific damages.” (Aff of Odriozola at 9, 10.) The fiduciary duty is “characterized” as a contract, either express or implicit, similar to an agency relationship, where, like under New York law, the defendant has “a duty to act” for the benefit of plaintiff. Moreover, as in New York, the relationship must be based on trust that one party will act on behalf of the other. (Aff of Odriozola at 5.) As the elements of this cause of action are substantially similar in New York and Argentina and the court sees no differences that would affect the outcome of this case, it will proceed using New York law.
Plaintiff’s counsel argues that the court should grant the breach of fiduciary duty default judgment because among other things as her “psychologist,” defendant was in a fiduciary relationship with her, and breached that duty by taking money for investments, and by having a sexual relationship with plaintiff and her daughter. (Proposed findings of facts and conclusions of law dated Dec. 16, 2011 at 29.) As damages, she asks for both the return of the investment money she gave defendant and the money she paid him for therapy.
To support this claim, plaintiff offers the affidavit of Lidia Ines Zablotzky dated December 29, 2009. Ms. Zablotzky is an Argentinian psychologist and member of the Tribunal of Ethics and Discipline of the Association of Psychologists of Buenos Aires. She opines that under the rules of ethics for psychologists in Argentina, a psychologist who begins a sexual or business relationship with a patient “can no longer be considered a psychologist” and does not have a right to receive payment for his services even if the patient is “not aware and continues to pay his fees.” (Report of Zablotzky at 5 [annexed to her aff].)
This evidence offered by plaintiff begs the question of why the case was brought as a breach of fiduciary duty rather than a malpractice action, as Ms. Zablotzky’s assertions seem more appropriate under the latter theory. (See Dupree v Giugliano, 20 NY3d 921 [2012] [upholding medical malpractice award against doctor for entering into a sexual relationship with plaintiff while providing her with mental health care].) Moreover, plaintiff does not cite to any case law in which doctor’s, or psychologist’s, fees were returned under a theory of breach of fiduciary duty.
Nevertheless, this court agrees that defendant, as plaintiffs psychologist, did have a fiduciary duty to her. (See United States v Willis, 778 F Supp 205, 209 [SD NY 1991]; Airey v Remmele, 38 Misc 3d 420, 428-429 [Sup Ct, Erie County *362 2012].) Defendant no doubt breached this duty when he engaged in sex with plaintiff and with her daughter. (See Airey, 38 Misc 3d 420 [finding cognizable claim of breach of fiduciary duty against marriage counselor who entered into sexual relationship with plaintiffs wife].) As a result of this breach of trust, plaintiff may now be able to recover some or all of the thousands of dollars she paid defendant as fees for therapy.
Whether or not the damages from defendant’s breach of fiduciary duty as a psychologist extend to the “investment” money plaintiff provided defendant in his role as “investor” is another matter. It may be questionable whether their financial dealings were within the scope of the psychologist-patient relationship for purposes of a fiduciary duty claim. (See Otto v Melman, 25 Misc 3d 1235[A], 2009 NY Slip Op 52421[U] [Sup Ct, Queens County 2009].) Nevertheless, this court need not decide that matter because, as discussed above, plaintiff has already established a case for fraud and unjust enrichment claims which will allow recovery of the “investment” money.
Therefore, the court grants a judgment for breach of fiduciary duty, but limits recovery under this theory to the fees plaintiff paid defendant for his services as her psychologist.
Damages
At an inquest where the defaulting party fails to appear, damages may be established on papers alone. (22 NYCRR 202.46; CPLR 3215 [f].) However, providing an affidavit merely stating the amount of damages requested is insufficient; plaintiff must also present admissible documentary evidence to support her claim. (Cf. Equidyne Corp. v Vogel, 160 AD2d 389, 390 [1st Dept 1990]; Pereloma v Valenteychik, 40 AD3d 833, 833 [2d Dept 2007]; Best Metro. Towel & Linen Supply Co., Inc. v Afternoones Rest. Corp., 21 Misc 3d 1105[A], 2008 NY Slip Op 51981[U] [Civ Ct, Kings County 2008].) In addition, if defendant appears at the inquest, although he may not make any arguments concerning his liability, he does have the right to contest the amount of damages. He may do this by cross-examining plaintiff’s witnesses, giving testimony and offering proof in mitigation of damages. (Conteh v Hand, 234 AD2d 96, 96 [1st Dept 1996].)
With the foregoing in mind, the court believes that plaintiff has provided sufficient expert and documentary evidence to prove a portion of the damages she requests on papers alone. That is to say, if defendant does not appear at the inquest hearing, *363 [4] there will be no need for plaintiff to prove the amounts discussed below. A portion of her request, however, has so far not been adequately established and, if plaintiff so desires to continue to pursue those damages, this will require introduction of documentary proof at the hearing, whether or not defendant appears.
1. Investment Payments to Defendant
In his financial reports and affidavits dated December 22, 2009 and December 16, 2011 respectively (the Welde report), plaintiff’s forensic accountant expert, Christopher A. Welde, cites to documentary evidence, including bank records and cancelled checks, to establish the amount of money plaintiff paid defendant for “investments” for the periods 1995 to 1997 and 2000 to 2004. He concludes that plaintiff gave defendant the following amounts for each year:
• 1995 - $424,000
• 1996 - $578,000
• 1997 - $652,000
• 2000 - $818,000
• 2001 - $723,000
• 2002 - $623,000
• 2003 - $649,000
• 2004 - $530,000
Mr. Welde explains that he reviewed documentary evidence, and based these sums on such evidence. Thus, the court finds that plaintiff has established damages for fraud and/or unjust enrichment in the amount of $4,997,000, the sum of the amounts cited above, for so-called “investment” money paid to defendant through checks she wrote during the years 1995 to 1997 and 2000 to 2004.
The Welde report, however, is insufficient to establish damages for “investments” for the period 1998 to 1999. For these years, dubbed the “gap years” by Mr. Welde, the amount of damages estimated was not grounded on documentary evidence from plaintiffs bank accounts, but only on Mr. Welde’s professional judgment. This court will not provide hundreds of *364 thousands of dollars in damages to plaintiff based solely on supposition, even that of an expert. Similarly, plaintiffs affidavit estimating that she gave defendant $500,000 per year from 1992 to 1994 for “investments” without any documentary evidence to support her claim is insufficient proof of her damages for those years as well.
2. Professional Fees Paid to Defendant
The court also finds that plaintiff has proved damages for breach of fiduciary duty for fees paid defendant for psychological services between 1995 and 1997 and 2000 and 2004. As above, the Welde report shows that Mr. Welde was able to calculate these fees by analyzing underlying bank records and cancelled checks. He sets forth that the following fees were paid:
• 1995 - $166,410
• 1996 - $217,500
• 1997 - $141,990
• 2000 - $206,550
• 2001 - $176,700
• 2002 - $184,000
• 2003 - $189,000
• 2004 - $ 76,000
Therefore, plaintiff has proved on papers a total of $1,358,150 in damages for breach of fiduciary duty.
Again, the court declines to grant damages at this time for fees paid defendant during the gap period of 1998 to 1999, and for the years 1992 to 1994. No documentary evidence was provided to prove damages for those years.
3. Personal Expenses Provided to Defendant for “Investments”
Plaintiff states that she gave approximately 20% of the cash she budgeted for personal expenses to defendant for “investments.” The court declines at this time to grant damages for these “investment” expenses. Although Mr. Welde was able to determine the dollar amount of the checks plaintiff cashed to use for her personal expenses between 1995 and 1997 and 2000 to 2004 based on her bank records, he did not state an opinion as to how much of this money, if any, plaintiff gave to defendant, presumably because he was not given information upon which to base an opinion. Furthermore, plaintiff, herself, does *365 not provide any evidence, other than her affidavit, to prove the amount of cash that she gave to defendant. Merely stating that she gave him “about” 20% is insufficient without backup evidence to prove her damages. If plaintiff desires to pursue this claim, she will have to produce documentary evidence at the inquest to support her allegation that she gave defendant 20% of the cash she had for personal expenses.
4. Other Requested Damages
Plaintiff asks for $500,000 in damages for money she says she gave to defendant after selling properties in Peru in 1993. Yet, plaintiff has not provided any documentary evidence to prove this claim. Evidence that she sold the property is not enough to substantiate her claim that she gave the proceeds of the sale to defendant. Similarly, plaintiff requests $500,000 in damages for money she claims she transferred to a bank account controlled by defendant in 1992. However, she has not provided any evidence to prove that this money was indeed transferred to defendant. Without more the court declines, at this point, to add these two items, totalling $1 million, to those damages proved on papers alone.
5. Offsets
Plaintiff offsets the amount of damages requested by certain monies she received from defendant over the years: (1) the $290,154 profit from selling apartments in Argentina given to her by defendant; (2) the $430,000 she kept in a cosmetic bag for “future investments” that plaintiff received back from defendant in late 2003 and 2004 when he was hiding assets from his estranged wife; and (3) the $30,000 defendant gave plaintiff in a suitcase in November 2004. At this point the court sees no reason why these amounts totalling $750,154 should not be offset from the total damage award as plaintiff concedes they were amounts paid back to her from the money she provided to defendant. Further, if successful at the hearing for a declaratory judgment, plaintiff will also offset the amount of money held in the Williamsport IDB account.
6. Prejudgment Interest
The award of prejudgment interest in cases of fraud, unjust enrichment and breach of fiduciary duty is proper where a defendant wrongly held a plaintiffs money (see CPLR 5001 [a]; Miot v Miot, 24 Misc 3d 1224[A], 2009 NY Slip Op 51605[U] [Sup Ct, NY County 2009], affd 78 AD3d 464 [1st Dept 2010]; see Eighteen Holding Corp. v Drizin, 268 AD2d 371, 372 [1st Dept 2000]; Huang v Sy, 62 AD3d 660, 661 [2d Dept 2009]). *366 Such damages should be calculated as the damages arise, for example “on the ending date of each year” that they are incurred. (Wolf v Rand, 258 AD2d 401, 404 [1st Dept 1999].)
Here, plaintiff correctly asks for prejudgment interest of 9% the statutory rate, on her damage claims. Further, the Welde report currently calculates this interest as of the last day of the year of the loss. For example, interest on the damages for “investment” monies and “therapy” fees for 1995 are calculated from December 31, 1995. While this undoubtedly is the correct way to calculate accrued interest, as a result of today’s decision, plaintiff needs to submit an updated expert affidavit calculating prejudgment interest to date, taking into consideration the amount of damages awarded either as of this writing, or after the hearing, less the offsets discussed herein.
Conclusion
For the reasons stated above, this court makes the following findings:
1. There will be an evidentiary inquest hearing concerning plaintiffs request for a declaratory judgment regarding ownership of the Williamsport Capital, Ltd. shares; and in so doing, the laws of BVI will apply.
2. The court grants a default judgment on the claims of fraud and unjust enrichment as to the “investment” money plaintiff gave defendant.
3. The court further grants a default judgment as to the claim of breach of fiduciary duty, but limits recovery under this cause of action to fees paid for “therapy” services.
4. With regard to the assessment of damages, the court finds, at this time, that the total amount of damages proved on plaintiffs papers is $6,355,150 ($4,997,000 for so-called “investment” money plus $1,358,150 for fees paid to defendant for psychological services) plus 9% statutory prejudgment interest.
5. The amount of damages will be offset by $750,154 plus prejudgment interest.[5]
6. A judgment may be entered in the above amount at the conclusion of the inquest, subject to any appropriate adjustments.
7. If plaintiff deems it advisable to pursue damages above and beyond the sum granted herein, she must bring documentary evidence on the day of inquest to support such claims.
*367 Therefore, in accordance with the foregoing, it is ordered that an evidentiary hearing be held on the request for a declaratory judgment; and if so advised, for further monetary damages in accordance with today’s decision, and it is further ordered that plaintiff Maria del Carmen Onrubia de Beeck may have judgment against defendant Gaspar Roberto Lopez Costa with regard to the claims of fraud, unjust enrichment and breach of fiduciary duty in the amount of $5,604,996 plus statutory interest, subject to adjustment, if any, at the conclusion of the inquest hearing, and it is further ordered that the inquest be held on February 26, 2013, or on another date if more convenient for the witnesses.

. Plaintiff originally filed the complaint in federal court. That case was dismissed without prejudice pursuant to a stipulation and order of the United States District Court of the Southern District of New York signed February 2, 2006.

. The factual background described herein is derived from the complaint, supplemental pleadings, deposition transcripts, and affidavits.

. See affirmation of Kathleen M. Kundar, dated Dec. 16, 2011 at 6 (relying on the deposition transcript of Ruben Wiernik, a former Argentinian IDB officer).

. As previously noted, it is unlikely defendant will appear at the inquest. In the poorly translated letters he has sent to court, he has indicated several times that he does not plan to attend the proceeding.

. This amount will also be offset by the value of the IDE account should the court find in favor of plaintiff with regard to her request for a declaratory judgment.